David B. GATEWOOD, Petitioner,

v.

**DISTRICT OF COLUMBIA WATER AND SEWER AUTHORITY,** Respondent.

No. 12–AA–368.

District of Columbia Court of Appeals.

Argued April 11, 2013.
Decided July 3, 2013.

Michael Joseph, Washington, DC, for petitioner.

Emil Hirsch, with whom Steven A. Pozefsky, Washington, DC, was on the brief, for respondent.

Before FISHER and OBERLY, Associate Judges, and FERREN, Senior Judge.

FERREN, Senior Judge:

This matter comes before the court on David B. Gatewood's petition for review of a decision by the District of Columbia Water and Sewer Authority (D.C. Water), rejecting his challenge to a water bill.

Gatewood argues that D.C. Water erred by failing to credit his unrebutted testimony that the utility charged him for water he did not use. In response the utility argues, initially, that this court lacks jurisdiction to consider Gatewood's petition for review because Gatewood admittedly failed to comply with the deadline for filing a petition for review established by 21 DCMR § 412.2 (1999), and thus failed to invoke the utility's own jurisdiction to hear his cause. If that argument lacks merit, D.C. Water contends that Gatewood failed to carry his burden to prove that his bill was erroneous.

We conclude that this court has jurisdiction to hear Gatewood's petition because § 412.2 is merely a claim-processing rule, which the agency waived by consenting to a hearing on the merits before a D.C. Water hearing officer. We further conclude that the hearing officer erred in failing to credit Gatewood with presenting a prima facie case that the excessive use of water transmitted by the meter on his property to a "data control unit" at D.C. Water was not attributable to him. We therefore reverse and remand the case for the hearing officer to determine the extent to which D.C. Water rebutted Gatewood's showing, and thus to determine how the matter should be finally resolved.

## I.

This case centers on a water bill showing excessive use at Gatewood's property during a single billing period in March 2010. Gatewood purchased the property, located at 137 36th Street, N.E., in 2006 intending to rent out each of its four separate units. The property was vacant when he purchased it and has remained so ever since. Previous water charges had been nominal,[1] reflecting no use, but on March

---

1. Before the March 19 bill, D.C. Water had charged Gatewood only "Metering Fee[s],"

19, 2010, D.C. Water mailed Gatewood a bill for $6,125.62. This bill reflected water use from February 1 to March 16, 2010, indicating that the property had drawn 683,672 gallons of water during a single forty-four day span.

Gatewood had been out of town when the bill arrived but contacted D.C. Water by phone the following month.[2] According to Gatewood's recollection of that phone conversation, a D.C. Water representative informed him that his bill would be investigated. Then, after receiving a letter from D.C. Water demanding payment for the unpaid balance, he contacted the utility again in May 2011. At that time, the utility informed him that it considered his bill valid and due. The utility reiterated this position in another letter dated August 26, 2011.

Gatewood retained *pro bono* counsel and petitioned the utility for a formal administrative hearing to challenge the bill. This petition, however, was untimely. D.C. Water's regulations require customers to request a formal administrative hearing within fifteen calendar days of the agency's written notice of . . . [t]he results of the investigation of the customer's challenge.[3] Gatewood's petition, dated October 25, came almost two months after he received the August 26 letter. Despite Gatewood's procedural stumble, on January 31, 2012, the utility proceeded to a formal hearing. There, Gatewood testified that, to the best of his knowledge, there had been no water

use on the property, as he had never turned on the valves that supply water there. He added that ever since he purchased the property, it had been boarded-up and padlocked. He further testified that only he and his brother had keys, and that one of them checked the property each week. He also testified that he had never noticed any sign of a break-in, and that after checking around outside the property he had seen "no sign of water." He added that he had never personally repaired any leak, nor had anyone else repaired a leak on his behalf.

Eileen Wright, a customer care associate with D.C. Water, also testified at the hearing. She took the position that Gatewood's bill was *per se* valid because he had failed to make a timely challenge to the charges. She apparently was relying on agency regulations that require a customer either to pay the bill under protest or to withhold payment and notify the utility in writing within ten working days after receipt of the bill, explaining why the bill is believed to be incorrect. If the customer fails to do either of these things, any subsequent challenge will be deemed untimely, inviting a penalty and possible termination of service.[4]

Ms. Wright further testified that, on March 18, 2010 (two days after the billing period at issue had ended), an agency record reflected that the meter transmittal unit (MTU) attached to Gatewood's water

---

"Impervious Area Charge[s]," and "DC Govt Stormwater Fee[s]." His bills following the February 1—March 16 billing period also charged him only with these administrative fees. All of the bills save for the March 19 bill reflect zero water use.

**2.** Gatewood testified before November the hearing officer that he had called D.C. Water in April 2010, but the agency's records do not reflect this phone call. Its records do indicate that he called in 2010. Nonetheless, the

hearing officer credited Gatewood's testimony, finding that he first contacted the agency in April.

**3.** 21 DCMR §§ 409.1–.2; 412.1–.2 (2003).

**4.** 21 DCMR § 402.2. On appeal, D.C. Water takes the position that the term "penalty" refers only to late fees. According to counsel at oral argument, "It is a . . . fixed fee. . . . It is an add-on to [the base charge]."

meter had indicated that there was high water consumption at the property. Therefore, added the witness, a technician had been sent to the property to take a look at the actual meter and verify that the read was correct. Ms. Wright explained that the MTU at each meter "transmits reads to data control units that are stationed ... in the D.C. area. And we have access to the meter reading through incoming pulled report[s]." In short, according to this testimony, D.C. Water had sent a technician to Gatewood's property just after the high-water consumption period to verify that the reading received by the relevant data control unit (from which a water bill apparently is derived) reflected the reading visible from the MTU on Gatewood's water meter. It is inferable from Ms. Wright's testimony, although she did not directly say so, that the technician verified that the meter "reads" at both ends of the transmission were the same.

After the hearing, a D.C. Water hearing officer issued written findings of fact in which she credited Gatewood's testimony that the property was vacant when he purchased it, and had remained so. She also credited his testimony that he had physically inspected the property after receiving the bill, but had detected no sign of break-in or water damage. However, she found "no evidence of meter malfunction" (more on this later). Based primarily on these findings (as well as a finding that the bill for $6,125.62 was due and unpaid), the hearing officer ruled that Gatewood had "failed to carry his burden of proof of showing by a preponderance of the evidence that the DC Water bill in his case was wrong."

More specifically, in her Conclusions of Law, the hearing officer determined that Gatewood had "failed to make a time[ly] challenge to the charges" at issue, citing 21 DCMR § 402, and had "failed to provide any basis as to why the disputed charges are incorrect"; that Gatewood's "check for the cause of the high water bill resulted in no explanation for the excessive consumption"; and that "[w]hen no reasonable explanation for excessive consumption exists, there is no basis upon which to adjust the bill," citing 21 DCMR § 408.1.[5] The hearing officer then explained in her Decision: "Notwithstanding the customer's failure to make a timely challenge to the bill, he presented no basis to adjust the bill. Accordingly, the decision of DC Water that [the] bill is valid and payable is affirmed." Gatewood has petitioned this court for review of the hearing officer's order.

## II.

■ As a threshold issue, we must address whether this court has jurisdiction to consider Gatewood's petition. On appeal, D.C. Water argues that because Gatewood failed to file a timely petition for an administrative hearing, the hearing officer lacked jurisdiction to consider his claim on the merits. Thus, the argument goes, although the officer rendered a decision, that decision was a nullity, and there is no valid final order for this court to review. We cannot agree.

Title 21, § 412 of the DCMR, entitled "Petition for Administrative Hearing," states that "[a] petition for administrative hearing shall be made in writing within fifteen (15) calendar days of the date of the

---

5. 21 DCMR § 408.1 (2003) provides, in full: "In cases in which all checks and tests result in inconclusive findings that provide no reasonable explanation for excessive consumption, no adjustment shall be made to the bill for any portion of the excessive consumption, except as may be approved by the General Manager, based upon a demonstration by the owner or occupant that such an adjustment will further a significant public interest."

notice specified by § 409.1 of this chapter."[6] There is no dispute that, under this section, Gatewood's petition was tardy. D.C. Water informed him in writing on August 26, 2011, that it considered his bill valid and due. Yet, he did not file his petition for review until October 25, 2011—almost two months after the regulatory decision. In that petition, however, Gatewood expressly asked the agency to waive compliance with § 412.2. The agency implicitly acceding to this request, proceeded to consider Gatewood's petition on the merits.

■■■ D.C. Water now contends that it could not have waived compliance with § 412.2, because the regulation's filing deadline is a jurisdictional bar. In other words, Gatewood's failure to strictly comply with the regulation divested the utility of the power even to consider his petition; waiver was not possible. The utility's position requires us to examine the relationship between administrative-filing deadlines and jurisdictional limitations. Jurisdictional rules limit the universe of controversies a decisionmaker may properly consider; when faced with a jurisdictional bar, the decisionmaker has no power to consider the case.[7] Jurisdictional rules may be raised at any point in the proceedings[8] and are not subject to waiver, however late they are invoked.[9] By contrast, nonjurisdictional rules and deadlines may be extended or waived.[10]

Traditionally, this court has deemed administrative appeal deadlines to be jurisdictional.[11] In *District of Columbia Pub. Employee Relations Bd. v. District of Columbia Metro. Police Dep't*,[12] we held that "[t]he time limits for filing appeals with administrative adjudicative agencies, as with courts, are mandatory and jurisdictional matters."[13] Whether the rule's application would cause "prejudice," we held,

6. 21 DCMR § 412.2.

7. *See Euclid St., LLC v. District of Columbia Water & Sewer Auth.*, 41 A.3d 453, 457 n. 2 (D.C.2012) ("[T]he court's lack of subject-matter jurisdiction cannot be waived."); *Smith v. United States*, 984 A.2d 196, 199 (D.C.2009) ("If the rule is 'jurisdictional,' its restrictions limit the cases properly before the court, regardless of whether the parties invoke it.").

8. *See Kontrick v. Ryan*, 540 U.S. 443, 455, 124 S.Ct. 906, 157 L.Ed.2d 867 (2004).

9. *See Chase v. Pub. Defender Serv.*, 956 A.2d 67, 75 (D.C.2008) (quoting *Customers Parking, Inc. v. District of Columbia*, 562 A.2d 651, 654 (D.C.1989)).

10. *See Sebelius v. Auburn Reg'l Med. Ctr.*, —— U.S. ——, 133 S.Ct. 817, 826, 184 L.Ed.2d 627 (2013) (holding that statutorily imposed time limit was nonjurisdictional, so agency could extend deadline); *Eberhart v. United States*, 546 U.S. 12, 15, 126 S.Ct. 403, 163 L.Ed.2d 14 (2005) (explaining that nonjurisdictional rules may be "forfeited if the party asserting the rule waits too long to raise the point" (quoting *Kontrick*, 540 U.S. at 458–60, 124 S.Ct. 906)); *Schacht v. United States*, 398 U.S. 58, 64, 90 S.Ct. 1555, 26 L.Ed.2d 44 (1970) (holding·that Court may waive compliance with "procedural rules adopted by the Court for the orderly transaction of its business," which are "not jurisdictional").

11. *See, e.g., Zollicoffer v. District of Columbia Pub. Sch.*, 735 A.2d 944, 945–46 (D.C.1999) ("The time limits for filing appeals with administrative adjudicative agencies, as with courts, are mandatory and jurisdictional matters."); *Woodley Park Cmty. Ass'n v. District of Columbia Bd. of Zoning Adjustment*, 490 A.2d 628, 635 (D.C.1985) ("The question of timeliness is jurisdictional."); *Goto v. District of Columbia Bd. of Zoning Adjustment*, 423 A.2d 917, 924 (D.C.1980) ("The question of timeliness is jurisdictional; if the appeal was not timely filed, the [agency] was without power to consider it.").

12. 593 A.2d 641 (D.C.1991).

13. *Id.* at 643.

is "irrelevant." [14] More recently, we held in *Kamerow v. District of Columbia Rental Hous. Comm'n*[15] that the Commission's ten-day appeal deadline is "mandatory and jurisdictional," [16] and thus that the Commission had no discretion to excuse a failure to comply. "A failure to file a notice of appeal within the required time period divests the agency of jurisdiction to consider the appeal." [17]

These pronouncements, however, do not conclude our inquiry. This division is not bound to follow precedent when its basis has been " 'substantially undermined' by subsequent Supreme Court decisions." [18] Although our prior decisions would appear to resolve the jurisdictional question against Gatewood, recent Supreme Court decisions suggest that we can no longer reflexively label administrative-appeal deadlines "jurisdictional." Rather, we must undertake a more nuanced examination, asking whether the rule at hand is truly jurisdictional or merely a "claim-processing" rule.

This court already has acknowledged the distinction between jurisdictional and claim-processing rules. In *Smith v. United States*, a division of this court changed our approach to Super. Ct.Crim. R. 35,[19] which we previously deemed mandatory and jurisdictional.[20] After observing that two recent Supreme Court decisions, *Bowles v. Russell*[21] and *Eberhart v. United States*,[22] had substantially undermined this court's treatment of Rule 35 as a jurisdictional bar,[23] we held that Rule 35 is merely a claim-processing rule, subject to waiver.[24] Since *Smith*, the Supreme Court has continued to move away from classifying administrative deadlines as "jurisdictional." [25] The Court has reiterated its dislike for the overuse of jurisdictional labels, cautioning against the undesirable effects a proliferation of jurisdictional rules can have: "Tardy jurisdictional objections can … result in a waste of adjudicatory resources and can disturbingly disarm litigants." [26] With these consequences in mind, the Court has attempted to " 'bring

14. *Id.*

15. 891 A.2d 253 (D.C.2006).

16. *Id.* at 257 (quoting *Zollicoffer*, 735 A.2d at 945–46).

17. *Id.*

18. *Smith v. United States*, 984 A.2d 196, 200 (D.C.2009) (quoting *Lee v. United States*, 668 A.2d 822, 828 (D.C.1995); *Frendak v. United States*, 408 A.2d 364, 379 n. 27 (D.C.1979)).

19. Rule 35 governs the time within which a criminal defendant must file a motion for reduction of sentence.

20. *Smith*, 984 A.2d at 200 (citing *Brown v. United States*, 795 A.2d 56, 62 n. 2 (D.C.2002); *Littlejohn v. United States*, 749 A.2d 1253, 1258 (D.C.2000)).

21. 551 U.S. 205, 127 S.Ct. 2360, 168 L.Ed.2d 96 (2007).

22. 546 U.S. 12, 126 S.Ct. 403, 163 L.Ed.2d 14 (2005).

23. *Smith*, 984 A.2d at 201.

24. *Id.* at 200–01.

25. *See Sebelius v. Auburn Reg'l Med. Ctr.*, —— U.S. ——, 133 S.Ct. 817, 824–25, 184 L.Ed.2d 627 (2013) (holding that statutory 180–day limit for filing appeals to the Provider Reimbursement Review Board was not jurisdictional); *Henderson v. Shinseki*, —— U.S. ——, 131 S.Ct. 1197, 1204–06, 179 L.Ed.2d 159 (2011) (holding that 120–day Veterans Court appeal deadline was not jurisdictional).

26. *Sebelius*, 133 S.Ct. at 824; *see also Kontrick v. Ryan*, 540 U.S. 443, 455, 124 S.Ct. 906, 157 L.Ed.2d 867 (2004) ("Clarity would be facilitated if courts and litigants used the label 'jurisdictional' not for claim-processing rules, but only for prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory authority.").

some discipline to the use' of the term 'jurisdiction.' " [27] As a result, the Court has "repeatedly" proclaimed that "filing deadlines ordinarily are not jurisdictional," but rather are "quintessential claim-processing rules." [28] These proclamations, we are persuaded, "substantially undermine[ ]" [29] our former approach to administrative agency deadlines.

In distinguishing between claims-processing and jurisdictional rules, the Supreme Court has explained that the former are rules typically promulgated by a decision-making body "for the orderly transaction of its business." [30] The latter, on the other hand, are most often legislative enactments "meant to be strictly imposed limits on the cases [a decisionmaker] may hear." [31] Regulation 21 DCMR § 412.2 is

essentially a rule of administrative convenience adopted by D.C. Water for the orderly administration of its billing process.[32] Its apparent purpose is not to limit the class of cases which the agency may consider, but to speed the process for contesting water bills.[33] Thus, the Council for the District of Columbia did not force § 412.2 upon the agency; the regulation's deadline is a self-imposed restriction,[34] bearing the indicia of a claim-processing rule.

We are therefore not persuaded that the regulation's "mandatory" language automatically makes it jurisdictional.[35] Not all rules stated in "mandatory" language, "however emphatic, are . . . properly typed jurisdictional." [36] Nor does the status of § 412.2 as an appeal deadline automatically imply a jurisdictional limitation. While

---

**27.** *Sebelius*, 133 S.Ct. at 824.

**28.** *Id.* at 825 (quoting *Henderson*, 131 S.Ct. at 1203).

**29.** *Smith v. United States*, 984 A.2d at 200.

**30.** *Id.* (quoting *Bowles*, 551 U.S. at 211, 127 S.Ct. 2360).

**31.** *Id.*

**32.** D.C. Water has authority to adopt, amend, and repeal the regulations under which it functions. In 1996, the Council of the District of Columbia transferred all functions of the former Water and Sewer Utility Administration to a new agency: the D.C. Water and Sewer Authority (WASA). Water and Sewer Authority Establishment and Department of Public Works Reorganization Act of 1996, D.C. Law 11–111. In 2010, WASA rebranded itself as D.C. Water. *History*, DCWATER.COM, *http://www.dcwater.com/about/history.cfm* (last visited April 12, 2013). In creating·the new agency, the Council granted it the authority to "make, adopt, and alter by-laws, rules, and regulations for the administration and regulation of its business and affairs." D.C.Code § 34–2202.03. Section 412 predates D.C. Water, having been adopted in 1993, 21 DCMR § 412 (citing 40 DCRR 1300), but the agency adopted the regulation as amended (and cur-

rently in force) in 1999. 46 DCRR 5358 (1999) (Notice of Final Rulemaking).

**33.** *See* Respondent's Brief at 1112 ("The need for . . . time limitations is obvious; the process by which D.C. Water's thousands upon thousands of customers protest their bills cannot be open-ended and arbitrary."); *cf. Scarborough v. Principi*, 541 U.S. 401, 414, 124 S.Ct. 1856, 158 L.Ed.2d 674 (2004) (holding that statutory time limit for filing attorney-fee reimbursement applications under Equal Access to Justice Act was not jurisdictional because time limit did not "describe what 'classes of cases,' the [court] is competent to adjudicate; instead, the section relate[d] only to postjudgment proceedings auxiliary to cases already within [the] court's adjudicatory authority" (internal citations omitted)).

**34.** See *supra* note 30; *cf. Bowles v. Russell*, 551 U.S. at 210, 127 S.Ct. 2360 (recognizing "jurisdictional significance of the fact that a time limitation is set forth in a statute").

**35.** 21 DCMR § 412.2 ("[A] petition . . . *shall* be made. . . ." (emphasis added)).

**36.** *Henderson v. Shinseki*, 131 S.Ct. at 1205 (quoting *Union Pac. R.R. Co. v. Bhd. of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment, Cent. Region*, 558 U.S. 67, 130 S.Ct. 584, 596, 175 L.Ed.2d 428 (2009)).

we noted in *Smith* that "time limits for filing a notice of appeal have been treated as jurisdictional in American law for well over a century,"[37] the limits of which we spoke concerned appeals from one court to another; they did not concern administrative deadlines.[38]

Accordingly, we hold that 21 DCMR § 412.2 is a claim-processing rule, not a jurisdictional rule, and thus that D.C. Water lawfully could, and indeed did, waive compliance with the rule when the agency's hearing officer proceeded to consider Gatewood's claim on its merits. We emphasize that D.C. Water did not have to waive the time limitation in § 412.2;[39] it can avoid potential prejudice to its operations by declining to do so. But waive the rule it did, and thus we proceed to review the hearing officer's decision.

### III.

### A.

As noted earlier, the hearing officer concluded as a matter of law that Gatewood

had "failed to make a time[ly] challenge" under 21 DCMR § 402, but then she ruled in her final decision: "Notwithstanding the customer's failure to make a timely challenge to the bill, he presented no basis to adjust the bill." Did she therefore make two, independent rulings—one on timeliness, the other on the merits—creating the possibility that a ruling on timeliness could resolve the matter without a review of the merits? At oral argument, counsel for D.C. Water clarified the agency's position: failure to meet the ten-day deadline imposed by § 402 will not preclude an administrative hearing on the merits of a customer challenge under § 412.[40] Thus, the hearing officer's conclusion that Gatewood's challenge had been "untimely" under § 402 did not itself resolve the issue. As counsel acknowledged, the consequence of the hearing officer's decision was "a merits-based consequence."[41]

### B.

The applicable regulations provide that an untimely challenge to a water bill "will

**37.** *Smith*, 984 A.2d at 200 n. 4 (quoting *Bowles*, 551 U.S. at 209 n. 2, 127 S.Ct. 2360).

**38.** *See Henderson*, 131 S.Ct. at 1203 (citing *Bowles*, 551 U.S. at 209 n. 2, 127 S.Ct. 2360).

**39.** *Cf. Schacht v. United States*, 398 U.S. 58, 64, 90 S.Ct. 1555, 26 L.Ed.2d 44 (1970) (explaining that Court may waive nonjurisdictional rules, promulgated by Court, in its discretion).

**40.** Counsel explained that the ten-day limit under § 402 has a two-fold purpose: "uniformity and allocation of responsibility of who has to do what when confronted with a timely challenge.... If [the customer] ... files a timely challenge in writing within the ten-day period, then there are certain investigations that D.C. Water will conduct [under 21 DCMR § 403]...." [In the absence of a timely challenge,] "you lose the benefit of some of the things that D.C. Water will do as part of the investigation." By that, counsel meant that much of the investigative burden as to

the cause of the water problem would fall on the customer: "Now, you as the customer ... it is your burden, you have to go get a plumber...." Counsel added that when a challenge is late under § 402, "[y]ou can still file a timely petition under the [§ 412] fifteen-day rule ... and you will get a hearing, but what will happen in the context of that hearing is different." Significantly, counsel added that if customers "miss the ten-day deadline, the fifteen-day deadline, what we as a matter of administrative practice [do,] regardless of how untimely it is, they do not deny hearings." In sum, counsel confirmed that D.C. Water does not employ § 402 to reject untimely filed challenges to water bills; nor does it rely on § 412 to bar administrative hearings on untimely filed appeals of agency decisions. Counsel then confirmed that the hearing officer in this case "did not throw [Gatewood] out cold on [§ 402 grounds].... The consequence [of the hearing officer's decision] is a merits-based consequence."

**41.** See *supra* note 40.

not stop the ·imposition of a penalty for nonpayment of charges or the possibility of termination of service for nonpayment"; [42] but, as counsel has acknowledged, untimeliness, as such, will not bar a challenge to the bill to avoid payment of the amount allegedly owed.[43] Rather, "[u]pon receipt of a challenge," D.C. Water "shall suspend the obligation ... to pay the contested charges ... pending investigation" [44] and, "[a]s necessary to investigate the challenge," shall (among other things): verify the "computations made" in formulating the water and sewer charges; verify "the meter reading for possible meter over-read"; check, if feasible, "the premises for leaking fixtures, underground invisible leaks, and house-side connection leaks"; and check "the meter for malfunction." [45] Upon completion of the investigation, the agency will issue a "written decision containing a brief description of the investigation and findings" and, if the investigation so indicates, "make appropriate adjustments to the bill." [46] Finally, as counsel also acknowledged, D.C. Water—despite its newfound jurisdictional argument that we have rejected in Part II.—has traditionally been willing to entertain an untimely petition for an administrative hearing to review a complaining customer's challenge to the agency's written decision.

As this case illustrates, Gatewood's untimely challenge to his whopping water bill, coupled with D.C. Water's willingness to accept that challenge all through the administrative hearing process, reflects both good intentions by D.C. Water and a muddled response to that challenge attributable in part, it would appear, to a regulatory scheme that does not anticipate untimely investigations and adjudications—as we shall see.

## C.

 We proceed to our standard of review. Our review of agency decisions is limited. We are required to "affirm unless we conclude that the agency's ruling was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." [47] " 'Factual findings supported by substantial evidence on the record as a whole are binding on the reviewing court, although this court may have reached a different result based on an independent review of the record.' " [48] A D.C. Water hearing officer is empowered, among other things, to "rule on motions" and "issue final decisions," [49] and is empowered to interpret the governing statute and regulations—interpretations to which we owe deference.[50]

---

42. 21 DCMR § 402.2; see *supra* note 4.

43. See *supra* note 40.

44. 21 DCMR § 403.1.

45. 21 DCMR § 403.2.

46. 21 DCMR § 404.1, –.2.

47. *King v. District of Columbia Water & Sewer Auth.*, 803 A.2d 966, 967 (D.C.2002).

48. *Morris v. EPA*, 975 A.2d 176, 180 (D.C. 2009) (quoting *McKinley v. District of Columbia Dep't of Emp't Servs.*, 696 A.2d 1377, 1383 (D.C.1997)).

49. 21 DCMR § 414(j), (k).

50. This contrasts with the authority of Administrative Law Judges in the Office of Administrative Hearings, who lack the power to issue authoritative regulatory interpretations. *See District of Columbia Dep't of Mental Health v. Hayes*, 6 A.3d 255, 258 (D.C.2010) (noting that, while this court ordinarily defers to the agency's interpretation of its own regulations, it does not accord " 'deference to the statutory interpretations of the Office of Administrative Hearings' " (quoting *Travelers Indemn. Co. v. District of Columbia Dep't of Emp't Servs.*, 975 A.2d 823, 826 n. 3 (D.C.2009))).

## D.

Once D.C. Water rejects a customer's challenge to a water bill and the customer requests an administrative hearing, the customer has the "burden of proof." [51] That term can mean either the "burden of production" or the "burden of persuasion." [52] When "burden of proof" is used to mean the "burden of production," it means that the proponent, commonly a party seeking relief, has "the initial burden of going forward with the introduction of evidence" sufficient to shift to the opponent the burden of producing evidence that rebuts the proponent's claim.[53] When used to mean "burden of persuasion," however—its more common use—the term "burden of proof" means that the proponent retains the ultimate burden of persuading the fact-finder of its position.[54]

 Both concepts are at work in a water bill controversy. When a D.C. Wa-

ter customer files a challenge stating "the reasons why the bill is believed to be incorrect," [55] those reasons trigger an obligatory investigation by the utility, leading to "findings" and a "written decision" [56] by the utility's "Administrator." [57] This may or may not result in adjustment of the bill. Through this part of the process, however, the customer's written proffer is a sufficient presentation of evidence, satisfying the "burden of production," that shifts to the utility the burden of investigation and response on the merits. If, as a result, the customer is unsatisfied with the Administrator's decision and wishes to proceed further by asking for an administrative hearing, the regulatory scheme shifts back onto the customer not merely the burden of production but, beyond that, the burden of persuasion by explicitly imposing at that point the ultimate "burden of proof" by a "preponderance of the evidence" on the "part[y] seeking relief." [58]

**51.** 21 DCMR § 420.7 (1999) ("The burden of proof shall be on the party seeking relief."); *see also* D.C.Code § 2–509 (2011) (in contested cases under the District of Columbia Administrative Procedures Act, "the proponent of a rule or order shall have the burden of proof").

**52.** Jacob A. Stein, Glenn A. Mitchell & Basil J. Mezines, Administrative Law § 24–12–13 (2012); *see also Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Greenwich Collieries,* 512 U.S. 267, 272, 114 S.Ct. 2251, 129 L.Ed.2d 221 (1994) (noting that the term "burden of proof" traditionally has covered the burdens of both "production" and "persuasion").

**53.** Stein et al., *supra* note 52, at 24–12. Commonly this situation occurs when there is an established presumption, such as the "statutory presumption of compensability" under the workers' compensation statute, which limits the claimant's initial burden of going forward. That particular presumption, when coupled with the claimant's "initial demonstration" of a work-related event that potentially contributed to death or disability, shifts the burden to the employer to "bring forth substantial evi-

dence" that the injury causing death or disability did not "arise out of and in the course of employment," *Ferreira v. District of Columbia Dep't of Emp't Servs.,* 531 A.2d 651, 655 (D.C.1987).

**54.** *See* Stein et al., *supra* note 52, at 24–11.

**55.** 21 DCMR § 402.1(b).

**56.** 21 DCMR § 404.1. The Administrator's findings and decision, conveyed to Gatewood by letter of August 26, 2011, from Charles E. Love, Customer Care Associate, stated in relevant part:

Bills may be challenged within 10 business days of receipt or you may pay the charges in full and challenge the charges prior to the mailing of the next bill. Your challenge does not meet these criteria. Therefore, the challenged charges are valid and payable.

**57.** 21 DCMR § 409.2.

**58.** 21 DCMR § 420.7, *supra* note 51; 21 DCMR § 420.8 ("The standard of proof shall be a preponderance of the evidence."). "Burden of proof" accordingly means "burden of

 To carry that burden of persuasion at the hearing, therefore, the customer must present a prima facie case showing that the customer was not responsible for the contested water use. If the customer does so, the burden of production shifts to the opponent—the utility—to respond with credible evidence in rebuttal.[59] If the utility does make a sufficient showing, the customer must trump the utility's response with evidence sufficient to carry the burden of persuasion, which remains always with the customer.[60]

Accordingly, at the administrative hearing Gatewood had the burden of establishing a prima facie case that he was not responsible for the excessive water charged to his property.[61] It would follow, therefore, that if Gatewood successfully presented such a case, the burden of production would have shifted to the utility to produce evidence in rebuttal—the ultimate burden of proof (persuasion) remaining with Gatewood.[62]

**E.**

 Having established the evidentiary framework, we turn to whether Gatewood presented a prima facie case sufficient to shift to D.C. Water the burden to produce evidence in rebuttal.

persuasion" because the required proof by a "preponderance of the evidence" cannot rationally be understood to mean *less* than preponderant proof that shifts another burden of production back to the opposing party.

59. *See Greenwich Collieries*, 512 U.S. at 280, 114 S.Ct. 2251 ("[W]hen the party with the burden of persuasion establishes a prima facie case supported by credible and credited evidence, it must either be rebutted or accepted as true."); Frank E. Cooper, 1 State Administrative Law 359 (1965) ("When a party on whom is placed the primary burden of proof has made a prima facie case, it is usually held that the burden of production shifts to the opposite party (although the burden of ultimate persuasion does not); and the opposite party must introduce proofs to counter the prima facie case made by the proponent." (footnotes omitted)).

60. The Supreme Court has observed that such burden-shifting reflects the most "sensible, orderly way to evaluate the evidence" in various contexts. *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978) (employment discrimination case). *See, e.g., Morris v. EPA*, 975 A.2d at 184 (in unemployment compensation case, employer's prima facie showing of misconduct—that employee was repeatedly absent without authorization—shifted to employee the burden to "produce evidence tending to establish that her absences were caused by genuine illness," whereupon the burden shifted back to em-

ployer to produce evidence sufficient to carry its "ultimate burden of proof" by showing, for example, that employee's claimed illnesses were "feigned" or "not severe enough" to justify her absences); *Larry v. Nat'l Rehab. Hosp.*, 973 A.2d 180, 183 n. 4 (D.C.2009) (in unemployment compensation case, employer's prima facie showing that employee repeatedly was absent or tardy after repeated warnings shifted burden to employee to show actions were not willful or deliberate, with burden shifting "back to the employer to disprove such evidence," keeping the "ultimate burden of showing misconduct ... always on the employer"); *Atlantic Richfield Co. v. District of Columbia Comm'n on Human Rights*, 515 A.2d 1095, 1099 (D.C.1986) (in case alleging employment discrimination based on personal appearance, once plaintiff has presented a prima facie case, "[t]he burden of production then shifts to the employer to rebut the presumption of discrimination by articulating some legitimate, nondiscriminatory reason for the employment action at issue," followed by "a fair opportunity" for the employee "to prove by a preponderance of the evidence that the employer's stated reason was ... in fact merely a pretext for discrimination"); *see also Logan v. Dep't of Emp't Servs.*, 805 A.2d 237, 242 (D.C.2002) (applying burden-shifting analysis in workers' compensation case).

61. See *supra* note 56.

62. See *supra* notes 59–60.

At the formal hearing, Gatewood presented unrebutted evidence tending to show that his water bill was erroneous. In particular, he testified that the property had been vacant since its purchase, that he had never used any water at the property, and that he had seen no sign of a leak. He further testified that although he had been out of town during the relevant billing period, the property had been boarded up and locked while he was away; that he had detected no sign of a break-in upon his return; and that the only other person with access to the property was his brother (who no one at the hearing suggested had caused the water loss). The hearing officer did not find that Gatewood's testimony was improbable, inconsistent, or incredible.[63] Gatewood's account was consistent with his documentary evidence, specifically, his water bills showing no water use before or after the billing period at issue.[64] Moreover, the hearing

officer, in elaborating her decision, expressly credited portions of his testimony, such as his statements that the property had remained vacant since its purchase, that he first contacted the agency about his water bill in April 2010 (not November 2010, the first contact date in the agency's records), and that he conducted a physical inspection of the property that revealed no signs of water damage or a break-in. The officer never implied that Gatewood's demeanor at the hearing was suspect.[65] Thus, even if Gatewood had no direct personal knowledge of water use on the property while he was away, his testimonial and documentary offerings amounted to circumstantial evidence, sufficient for a prima facie case, that there had been no use or leak of water attributable to him and must, accordingly, be the responsibility of D.C. Water.[66]

The hearing officer concluded, however, albeit implicitly, that Gatewood had not

---

**63.** We have recognized "a [rebuttable] presumption that each witness, including the parties, has sworn to [tell] the truth." *Belcon Inc. v. District of Columbia Water & Sewer Auth.*, 826 A.2d 380, 386 (D.C.2003) (quoting *Ross v. Fierro*, 659 A.2d 234, 239 n. 5 (D.C. 1995)) (alteration in original). This presumption carries even "greater force when the witness'[s] testimony is uncontradicted." *Id.* And while this presumption can be overcome by "any negative impression that the trier of fact may have on a witness'[s] demeanor," *id.* at 386–87, we have explained that "[o]rdinarily, positive testimony which is not inherently improbable, inconsistent, contradicted, or discredited cannot be disregarded or ignored . . . by any trier of fact." *Id.* at 386 (quoting *Perlman v. Chal Bro, Inc.*, 43 A.2d 755, 756 (D.C.1945)); *see also Hamilton v. Hojeij Branded Food, Inc.*, 41 A.3d 464, 473 (D.C. 2012) (quoting *Belcon*); *but see Golding–Alleyne v. District of Columbia Dep't of Emp't Servs.*, 980 A.2d 1209, 1216–17 (D.C.2009) (holding claimant's evidence may be so weak that decisionmaker may justifiably conclude that claimant failed to carry burden of proof even though agency presented no contravening evidence).

**64.** Gatewood's bills from the two billing periods prior to February 1 showed no water use at all. Likewise, bills for the periods following March 16 showed zero use. The only bill reflecting any use whatsoever was the February 1–March 16, 2010 bill, in which the agency charged Gatewood $6,125.62 for 683,672 gallons of water. This drastic swing in use levels—from zero to 683,672 gallons, then back to zero—was consistent with Gatewood's narrative.

**65.** Indeed, Gatewood was remarkably candid at the hearing, admitting that he initially registered the property for a D.C. Water account in order to avoid paying vacant-property taxes.

**66.** *Cf. New 3145 Deauville, LLC v. First Am. Title Ins. Co.*, 881 A.2d 624, 628 (D.C.2005) (holding that trial court could properly enter summary judgment against customer where customer's affidavit "spoke only in generalities," such as "the balance on the account is not as alleged" and "[D.C. Water] failed to give proper credit to bills that were not paid on time").

established a prima facie case against D.C. Water primarily because he had not carried his burden of proving the only reasonable basis for faulting the utility, namely, meter malfunction.[67] The officer found as a fact that there was "no evidence of meter malfunction." The officer then concluded that Gatewood had offered "no explanation for the excessive consumption"; had thus "failed to provide any basis as to why the disputed charges are incorrect"; and, as a result, had demonstrated "no basis upon which to adjust the bill," citing 21 DCMR § 408.1.[68]

The question, then, becomes: whether proof of meter malfunction, absent other explanations, was part of the prima facie case necessary for Gatewood to justify an adjustment of an overly high water bill. More specifically, must this court defer to the hearing officer's implicit, unexplained ruling that Gatewood had that burden? While we ordinarily would defer to the hearing officer's interpretation of the agency's regulations,[69] it would not be appropriate to defer to an interpretation that is merely implicit[70] and, as we shall explain, is at odds with the regulatory scheme.

Commonly, we assume, a customer's complaint about a water bill is resolved routinely either by the utility's acknowledgment of a billing error or by the customer's acceptance of an explanation revealing the customer's own mistake. Burden of proof does not become an issue. But when easy resolution is impossible and the customer initiates a "challenge," the regulations, as we have noted, require the agency "to investigate."[71] Although the investigative actions the agency must take are limited to those that are "necessary"[72] under the circumstances, the regulations place the burden to "[c]heck for meter malfunction"—undoubtedly necessary under the circumstances here—squarely on the agency. Obviously, if a customer could prove meter malfunction, that evidence would strengthen the customer's prima facie case. But nothing in the regulations *requires* the customer to present evidence

---

67. The hearing officer cited nine findings of fact in concluding that Gatewood "ha[d] failed to provide any basis as to why the disputed charges are incorrect." The ninth finding, "no evidence of meter malfunction," is the only one that concerns D.C. Water's potential responsibility for the high water use—a potential responsibility that the hearing officer found Gatewood had failed to include and prove as a "basis" for the disputed charges. The other eight findings recite the nature of the property, the period in dispute, Gatewood's acknowledgment that he had established water and sewer service "for the purpose of evading the vacant property tax rate," the amount of the charges at issue, Gatewood's testimony about contacting D.C. Water to protest the bill and acknowledging the untimeliness of his call, witness Wright's testimony about sending Gatewood duplicate bills, Wright's testimony that the bills remained unpaid, and Gatewood's testimony that he had inspected the property without finding "evidence of water damage or of a break-in."

68. See *supra* note 5.

69. See *supra* note 50 and accompanying text.

70. *See Euclid Street, LLC v. District of Columbia Water & Sewer Auth.*, 41 A.3d 453 (D.C. 2012) (holding that because the "WASA Hearing Officer declined to opine on the legal and statutory issues presented here ... our review of the relevant statute and regulations is *de novo.*"); *Prometheus Radio Project v. F.C.C.*, 373 F.3d 372, 406 (3d Cir.2004) ("[W]e may not supply a reasoned basis for the agency's action that the agency itself has not given...." (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983))).

71. 21 DCMR § 403.2.

72. *Id.*

of meter malfunction to make such a case.[73] And given the regulatory scheme, it is clear that if a customer can present a prima facie case sufficient to exclude his own responsibility for the excess use of water, as Gatewood has done here, the burden of evidentiary production shifts to D.C. Water—often, if not always, making it necessary for the utility to "[c]heck for meter malfunction" and disprove it.

### F.

██ The next question, then, is whether D.C. Water rebutted Gatewood's prima facie case, or at least brought the matter into equipoise ("inconclusive findings") under 21 DCMR § 408.1,[74] permitting adjustment in Gatewood's favor if D.C. Water's General Manager concludes that doing so would further a "significant public interest."

██ Fundamentally, the agency contends that, because Gatewood was out of town during the relevant billing period, he was not in a position to testify that no water had been drawn for use on his property. In making this argument for the first time now, in this appeal [75] D.C. Water equates Gatewood's testimony presenting circumstantial evidence with a presentation of no evidence. There is no requirement, however, that a party carry its bur-

den of proof by direct evidence. Even in the context of criminal proceedings, where the burden of proof is far greater than in civil matters, we have recognized that "[c]ircumstantial evidence is not intrinsically inferior to direct evidence." [76] In fact, this court "make[s] no distinction" between the two.[77] Thus, while Gatewood's testimony was only circumstantial evidence that no one for whom he could be held responsible had used water on his property during the relevant billing period, that does not mean his evidence was inherently insufficient.

In its own case, D.C. Water submitted virtually no evidence to contradict Gatewood's version of events and presented incomplete evidence about meter malfunction. Counsel for D.C. Water relied exclusively on the hearing testimony of the agency's only witness, Eileen Wright, who said that the agency, alerted by the unusual amount of water use, had sent a technician to the property. But this testimony, as it developed, did not contradict Gatewood's evidence, nor did it otherwise tend to establish that the recorded outflow of water—683,672 gallons in forty-four days—had been attributable to Gatewood's actions, not those of D.C. Water.

Ms. Wright's testimony was noteworthy for an apparent, major omission. She did

---

73. One court has observed that it would be "unreasonable to expect that the average consumer would have the financial resources to hire independent expert witnesses to contest the meter's readings" as part of the consumer's prima facie case. *Miami–Dade Cnty. v. Reyes*, 772 So.2d 24, 29 n. 1 (Fla.Dist.Ct.App. 2000). In most instances, the cost of hiring such an expert would substantially exceed the cost of simply accepting the error and paying the bill. *Id.*

74. See *supra* note 5.

75. Ordinarily, " '[a]dminstrative and judicial efficiency require that all claims be first raised at the agency level to allow appropriate

development and administrative response before judicial review.' " *Orius Telecomm., Inc. v. District of Columbia Dep't of Emp't Servs.*, 857 A.2d 1061, 1068 n. 10 (D.C.2004) (quoting *Hughes v. District of Columbia Dep't of Emp't Servs.*, 498 A.2d 567, 570 (D.C.1985)).

76. *Bernard v. United States*, 575 A.2d 1191, 1193 (D.C.1990).

77. *Id.*; *cf. Cooper, supra* note 53, at 360 ("Where the evidence introduced on behalf of the proponent is merely circumstantial, it is often said that the inference derived therefrom gives rise to a rebuttable presumption of fact.").

not say that D.C. Water's technician had checked the meter itself for a possible malfunction that triggered this mind-boggling reading; rather, her testimony merely indicated that soon after the water bill was issued, the meter reading for Gatewood's property—transmitted by the MTU and received at the relevant "data control unit" (used to determine the water bill)—corresponded to the reading on Gatewood's meter itself. That, however, is not a conclusive revelation; it is not evidence that the meter at the property, at all relevant times, had been operating free of mechanical malfunction. As we understand Ms. Wright's testimony, the inspecting technician did little, if anything, more than assure D.C. water that the meter's *transmission* apparatus attached to the meter was operating properly; the technician did nothing to ensure that the meter's *recording* function—its gallon counter—was operating properly.

Ms. Wright acknowledged that if Gatewood had filed a timely challenge to his bill, and if his own plumber had not found a leak, D.C. Water would have sent an investigator to the property to look for an underground "leak on the water service line."[78] In the process, the investigator would have "examined the meter." When asked by Gatewood's counsel whether an investigator had "ever found a faulty meter," Ms. Wright answered "Yes," although she was not aware of one that had recorded "a very large amount of water in a very short period of time." She added that one cannot "move the dial with your fingertip"; the meter is "enclosed . . . in a case," requiring "tools" to get into it.

Ms. Wright's testimony therefore confirmed that typical investigations include examination of the water meter, that "faulty" meters are sometimes found, and that only the transmitter function was examined at Gatewood's property. Her testimony left open the possibility of a data-recording malfunction. Her additional testimony that she was not aware of a meter malfunction causing the extraordinary water use at Gatewood's property, coupled with her comment indicating that water meters are not accessible without tools, provided mere kernels of circumstantial evidence of no meter malfunction or tampering.

D.C. Water has never suggested that Gatewood's water meter was inaccessible for testing. If it had tested the meter's mechanical workings—something it apparently does routinely when a bill is timely challenged and the property owner has not found a leak[79]—then D.C. Water may have put itself into a position to rebut Gatewood's prima facie case that he lacked responsibility for the outflow. Or perhaps the result might have been "inconclusive findings that provide no reasonable explanation for excessive consumption," leading to an adjustment of the bill or not, depending (as the applicable regulation says) on whether the agency's General Manager concludes that "an adjustment will further a significant public interest."[80] But absent sufficient mechanical evidence about Gatewood's water meter in this case, or some meaningful circumstantial evidence tending to show that an error was unlikely and the bill was valid, we cannot affirm the hearing officer's ruling, given the acknowl-

---

78. The witness explained that investigation of a water service line begins "by shutting off the service valve" on the property "to see if the meter continues to spin." If it does, that would indicate a leak in the service line on the property.

79. *See* 21 DCMR ' 403.2(d).

80. 21 DCMR ' 408.1.

edgment by D.C. Water's own witness that water meters do malfunction.

Because Gatewood's testimony eliminated virtually every possible responsibility he might have had for the water flow, D.C. Water, for the reasons we have elaborated, was obliged to rebut his presentation with substantial evidence to the contrary. It did not do so. And yet as far as the record shows, only the agency had the opportunity and expertise to launch the kind of investigation required to get to the bottom of this unusual situation. The hearing officer's finding that there was "no evidence of meter malfunction" would have been true if she had limited her finding to no "direct" evidence. But she overstated. Gatewood's testimony assuredly was circumstantial evidence that the problem lay with the meter. Moreover, the hearing officer's "no evidence" finding cannot be legitimately taken to confirm that the water meter had passed all relevant inspections, because the meter itself was not tested by the agency's technician for proper recording of water use on Gatewood's property.

█ In sum, D.C. Water's regulations provide a meaningful opportunity for customers to challenge their bills.[81] To keep this opportunity meaningful, the hearing officer must (1) accept a customer's credible, unrebutted evidence of an erroneous bill, and (2) shift the burden of evidentiary production to D.C. Water once the customer has established a prima facie case of non-responsibility.[82] The hearing officer erred in failing to follow this burden-shifting procedure.

## G.

At oral argument, counsel for D.C. Water explained the utility's willingness to allow challenges and hearings, respectively, after the time limitations in 21 DCMR §§ 402 and 412 have expired. The utility does so, he said—essentially repudiating our analysis in part II—because a water bill challenge after expiration of the ten-day limit in § 402 shifts the burden of conducting the investigation and locating the cause of excessive water use away from D.C. Water onto the customer.[83] Thus in this case, counsel argues, the utility should prevail on the merits because Gatewood has not carried that investigative burden. In simpler words, what one hand gives, the other hand takes away; the customer's price for an untimely challenge to a water bill is assumption of the utility's investigative burden for a timely challenge, converting a matter of right to one of grace.

D.C. Water did not make this argument to the agency's hearing officer, nor did the contention appear in its brief on appeal. It came for the first time as we explored at oral argument the implications, if any, of the willingness of D.C. Water, on the one hand, to entertain untimely challenges (a policy of benefit to its customers) and of the prejudice to D.C. Water, on the other

---

81. *See* 21 DCMR § 410.1(a) (2012) ("The purpose of hearings held under this section is to provide the petitioner with an opportunity to appeal the decision of the General Manager pertaining to ... [t]he validity of any water, sewer or groundwater sewer service charge.")

82. *Compare Belcon Inc. v. District of Columbia Water & Sewer Auth.,* 826 A.2d at 387 (holding agency ruling not based on substantial evidence because "without explanation, [it] apparently ignored uncontradicted testi-mony") *with McKinley v. District of Columbia Dep't of Emp't Servs.,* 696 A.2d 1377, 1386 (D.C.1997) (holding "in light of the [fact-finder's] unique position to assess [witness] credibility" that hearing examiner's decision to credit some testimony over conflicting testimony is "binding on this court," so long as supported by substantial evidence).

83. See *supra* note 40.

hand, from delays that inhibit its investigations. As counsel recognized, the regulations do not explicitly deal with the situation presented here: how they apply, if at all differently, to a challenge filed after—indeed, many weeks after—the prescribed ten days. There is nothing in the regulations, however, to suggest that once the agency waives the § 402 time limitation, the burden of investigation or any element of it shifts to the customer. We, therefore, cannot craft an exception to the regulatory scheme—in particular, an exception that would shift a burden of investigation—in cases of untimely challenges to a customer's water bill pursuant to § 402.[84]

## IV.

We conclude that the hearing officer erred in holding that Gatewood failed "to provide any basis as to why the disputed charges are incorrect," or any "reasonable explanation for [the] excessive consumption." To the contrary, as we have explained, absent any adverse determination regarding Gatewood's credibility, his testimony and related documentary evidence (water bills from before and after the unexplained water surge) presented a prima facie case that the water charge at issue was not his responsibility. The evidentiary burden of production was thereby shifted to D.C. Water to rebut Gatewood's evidence or at least establish from all the evidence that the result must be found "inconclusive" pursuant to 21 DCMR § 408.1 (with the disposition ultimately the responsibility of D.C. Water's General Manager "in the public interest"). We further explained that, contrary to the hearing officer's decision, Gatewood did not have the burden of proving meter malfunction as part of his prima facie case; the burden as to the meter shifted to D.C. Water either to show that Gatewood's meter had functioned properly in all essential respects, or at least to present persuasive circumstantial evidence that malfunction was unlikely. The hearing officer, however, made neither finding.

We therefore must reverse and remand the case for further proceedings consistent with this opinion.

*So ordered.*

---

84. We are particularly hesitant to adopt such a reading—which clearly goes beyond the plain text of the regulation—when the agency has yet to offer its own authoritative interpretation on the matter. *See King v. District of Columbia Dep't of Emp't Servs.*, 742 A.2d 460, 466 (D.C.1999) (" '[O]rdinarily,' ... 'this court will not attempt to interpret the agency's statute until the agency itself has done so.' " (quoting *Wahlne v. District of Columbia Dep't of Emp't Servs.*, 704 A.2d 1196, 1199 (D.C.1997))).