*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 13-CV-1026 & 15-AA-740

STEVON MATHIS, APPELLANT,

V.

DISTRICT OF COLUMBIA HOUSING AUTHORITY, APPELLEE.

Appeal from the Superior Court of the District of Columbia
(CAB-3590-13)
(Hon. Michael L. Rankin, Trial Judge); and

Petition for Review of a Final Decision
of the District of Columbia Housing Authority
(C16-10)

(Argued November 5, 2014; Reargued June 2, 2015    Decided October 8, 2015)

*Julie H. Becker*, Legal Aid Society of the District of Columbia, with whom *John C. Keeney, Jr.*, Legal Aid Society of the District of Columbia, was on the brief, for appellant. *Jonathan H. Levy*, Legal Aid Society of the District of Columbia, entered an appearance for appellant.

*Frederick A. Douglas*, with whom *Curtis A. Boykin* and *Alex M. Chintella* were on the brief, for appellee.

*Karl A. Racine*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General, *Loren L. AliKhan*, Deputy Solicitor General, and *Stacy L. Anderson*, Senior Assistant Attorney General, were on the brief for the District of Columbia, *amicus curiae*, in support of appellant.

*Catherine E. Stetson*, *Shannon T. Hodge*, *Rebecca Lindhurst*, and *Vytas Vergeer* were on the brief for Bread for the City, *amicus curiae*, in support of appellant.

Before EASTERLY and MCLEESE, *Associate Judges*, and REID, *Senior Judge*.

Opinion for the court by *Associate Judge* EASTERLY.

Opinion by *Associate Judge* MCLEESE, concurring in part and dissenting in part, at page 45.

EASTERLY, *Associate Judge*: Stevon Mathis seeks review of the decision of the District of Columbia Housing Authority ("DCHA") to terminate his federally funded rental assistance administered through the Housing Choice Voucher Program ("HCVP"). He argues that the DCHA's termination decision was unsupported by the agency's factual findings and was based on reasons for which Mr. Mathis was never given proper notice.

Potentially impeding our review of the merits of Mr. Mathis's case is a procedural wrinkle caused by a DCHA regulation, 14 DCMR § 8905.4 (a) (2005), which suggests that HCVP participants must file suit in the Superior Court to obtain judicial review of adverse decisions by the DCHA. Mr. Mathis did this with the DCHA's tacit approval (which was later explicitly expressed in its briefing to this court). The alignment of the parties notwithstanding, the Superior Court questioned its jurisdiction because it determined that Mr. Mathis's agency case was "contested" and, under the District of Columbia Administrative Procedure Act

("DCAPA"), D.C. Code § 2-510 (a) (2012 Repl.), should have been reviewed directly by this court. It is the Superior Court's order dismissing Mr. Mathis's case for lack of jurisdiction that Mr. Mathis initially asked us to review in his Notice of Appeal.

As the DCHA ultimately conceded at re-argument, given the nature of the DCHA's termination proceedings, the Superior Court was right. We thus affirm the trial court's determination that it lacked jurisdiction to review the DCHA's voucher termination decision.

We nevertheless directly reach the merits of the DCHA's voucher determination decision because, while this appeal was pending, Mr. Mathis filed with this court a petition for review of an agency order. *See* D.C. App. R. 15 (a)(2). We conclude that Rule 15's thirty-day filing deadline is a claim-processing rule that may be equitably tolled, and, under the circumstances presented, we find ample basis for equitable tolling. Assessing the DCHA's termination decision, we are persuaded by Mr. Mathis's challenge to the sufficiency of the evidence, and thus we reverse.

## I.     Facts and Procedural History

In April 2008, Stevon Mathis signed a lease for an apartment on 36th Street N.E. with the assistance of a HCVP voucher.  The HCVP, colloquially referred to as the "Section 8" program, is the federal rental housing subsidy program that was created by Section 8 of the Housing and Urban-Rural Recovery Act of 1983, which amended the United States Housing Act of 1937.  *See* 42 U.S.C. § 1437f (2013). The program was established "[f]or the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing." *Id.* at § 1437f (a).  The subsidy or "voucher" is portable and allows HCVP participants some measure of choice in which apartment to rent.  The program is administered locally by Public Housing Agencies ("PHAs"); the DCHA is the PHA that administers the program in the District.  D.C. Code § 6-202 (b) (2012 Repl.).

In October 2009, a year and a half after he signed his lease, Mr. Mathis received notice that DCHA was terminating his participation in the HCVP.  The notice, which was in the form of a postcard, stated that Mr. Mathis had "fail[ed] to

comply with [his] Family Obligations in the Housing Choice Voucher Program."[1]

Under a heading entitled "Summary of Facts" it stated: "TENANT ARRESTED FOR CRIMINAL [sic] RELATED ACTIVITY: ON 09/11/2009, PURSUANT TO A SEARCH WARRANT AND UNAUTHORIZED OCCUPANCY." And, under a heading entitled, "Regulation Reference," it listed without further explanation three federal regulations: 24 C.F.R. § 982.553 (c) (2015),[2] 24 C.F.R. § 982.551 (l)

---

[1] At the time Mr. Mathis received this notice, the definition of "family obligations" was set out in the DCHA's "Administrative Plan." DISTRICT OF COLUMBIA HOUSING AUTHORITY, ADMINISTRATIVE PLAN FOR THE HOUSING CHOICE VOUCHER PROGRAM, Ch. 17, at 102-03 (2003) (defining family obligations). Among other things, families receiving vouchers were prohibited from "engag[ing] in drug-related criminal activity," which is defined as "felonious use or possession (other than with intent to manufacture, sell or distribute), of a controlled substance." *Id*. at 103. Families were also required to "[u]se the dwelling unit solely for residence by the Family," *id*., whose composition ordinarily had to be "approved by the PHA," 24 C.F.R. § 982.551 (h)(2) (2015); *see also* 24 C.F.R. § 982.4 (b) (2015) (defining family as "[a] person or group of persons, as determined by the PHA . . . approved to reside in a unit with assistance under the program"); *but see infra* note 5 (explaining when visitors will be considered "a member of the household").

DCHA regulations supplanted the Administrative Plan in 2012. *See* 14 DCMR §§ 4900-5999 (2012) (all current DCHA regulations for the HCVP).

[2] Section 982.553 (c) authorizes termination of HCVP benefits if it is established by a "preponderance of the evidence" that a "household member has engaged in [criminal] activity, regardless of whether the household member has been arrested or convicted for such activity." *See also* ADMIN. PLAN, Ch. 17, at 104 (violation of family obligation may be established by "preponderance of evidence that the family, including any family member, is engaged in drug-related criminal activity").

(2015),[3] and 24 C.F.R. § 982.551 (h)(2) (2015).[4]  The postcard notice advised Mr. Mathis that he had the right to "appeal" the DCHA's termination decision at an "informal hearing," and that to do so, he had to sign and date the postcard and return it to the agency "within 30 days of the postmark on this letter."

Within a week of receiving his postcard notice, Mr. Mathis requested a hearing.  In the letter acknowledging his request, the DCHA informed Mr. Mathis that he had "the following rights: a) to examine before the hearing, and, to copy all documents, record, and regulations of DCHA that are relevant to the hearing; b) to be represented by counsel or other representatives at [his] expense; c) to confront and cross-examine adverse witnesses; [and] d) to present evidence on [his] behalf."

The hearing was conducted in April 2010 by a Hearing Officer from the DCHA's Office of Fair Hearings.  An attorney appeared for the DCHA; Mr. Mathis represented himself (he had been given a continuance to try to find counsel

---

[3]  Section 982.551 (l) provides in pertinent part that "[t]he members of the household may not engage in drug-related criminal activity . . . that threatens the health, safety, or right to peaceful enjoyment of other residents and persons residing in the immediate vicinity of the premises (see § 982.553)."

[4]  Section 982.551 (h)(2) provides in pertinent part that "[t]he composition of the assisted family residing in the unit must be approved by the PHA" and "[n]o other person [i.e., nobody but members of the assisted family] may reside in the unit."

but his efforts were unsuccessful). At the hearing, counsel for the DCHA acknowledged that Mr. Mathis could not have been arrested for drug activity on September 11, 2009, as the termination notice stated, because Mr. Mathis had been incarcerated on that day. Nonetheless, the DCHA's new theory was that Mr. Mathis's "brother," Ernest Leon Ratchford, had been arrested on September 11, 2009, in conjunction with the execution of a search warrant at the 36th Street apartment; the DCHA argued that Mr. Ratchford was not "part of the [HCVP] approved family composition," the implication being that he was not authorized to reside in the subsidized apartment for more than thirty days, and that, having done so, he became a de facto "family member"[5] for whose conduct Mr. Mathis could be held liable.[6]

To prove its case, the DCHA called one witness, a DCHA investigator. The investigator testified that he had received a complaint from the landlord about a search warrant being executed at the 36th Street apartment on September 11, 2009.

---

[5] Under the Administrative Plan, an adult visitor may stay in a dwelling unit "for up to 30 days." ADMIN. PLAN, Ch. 17, at 40. If an adult visitor exceeds this limit, he or she "will be considered a member of the household." *Id*.

[6] *See supra* notes 1 & 5. At the hearing, the DCHA also argued that Mr. Mathis could be terminated for his own unspecified criminal drug activity. But as the DCHA presented no evidence regarding this activity, and, as it did not ultimately serve as a basis for the DCHA's final termination decision, we do not detail or address this argument.

He obtained a copy of the warrant and determined that Mr. Mathis was not at home when the warrant was served, but two other men, identified in police reports as Ernest Leon Ratchford and Ralph A. Coleman, were.[7] Based on these documents, the investigator testified that the two men were arrested, and that one of them told the police he was Mr. Mathis's brother.[8] The investigator also testified that he visited the 36th Street apartment on October 7, 2009, and spoke to Mr. Ratchford, who identified himself as Mr. Mathis's brother. According to the investigator, Mr. Ratchford said that Mr. Mathis was no longer incarcerated but that he was not at home because he was out looking for a moving truck as "they were in the process of moving." The investigator then testified that Mr. Mathis called him "[a] day or so later" and that Mr. Mathis told the investigator that he had not been at home on

---

[7] Counsel for the DCHA put in evidence both the returned warrant and the supporting affidavit, which indicated that, "[i]n the past 72 hours" before the affiant drafted the affidavit on September 4, 2009, a confidential source employed by the police had purchased drugs from the apartment. This affidavit contained no identifying information as to the seller, other than to say he was a black male.

[8] Counsel for the DCHA put in evidence Mr. Ratchford's arrest report. The report lists the 36th Street apartment as Mr. Ratchford's address but does not identify the source of that information. It also states that Mr. Ratchford was charged with possession of heroin. The returned warrant identifying items recovered from the search listed (1) a "plastic ziploc bag containing a white rock substance" (but gave no indication of size or weight) and (2) a "plastic ziploc bag containing a tan powder substance" (but again gave no indication of size or weight).

September 11, 2009, that Mr. Ratchford was his brother, and that Mr. Ratchford had stayed with him for an unspecified amount of time.[9]

Mr. Mathis made an opening statement and testified on own behalf at the hearing. He explained that he had been incarcerated on a probation violation during the time when drugs were sold from his apartment and the search warrant was executed.[10] He argued that he should not be held responsible for what had taken place in the 36th Street apartment while he was incarcerated. He explained that there had been a lot of criminal activity in the building and that other residents had already moved out. He too had found "another apartment the month before all

---

[9] The investigator specifically testified that Mr. Mathis told him that Mr. Ratchford had been "living with him for a period of time." According to the investigator's report (which was also admitted into evidence), however, Mr. Mathis told the investigator only that Mr. Ratchford "stay[ed] with him from time-to-time," and it appears from the Hearing Officer's findings of fact that the Hearing Officer determined Mr. Mathis had made the latter statement, not the former.

[10] Confirming this testimony, the DCHA put into evidence the docket from Mr. Mathis's 2007 misdemeanor drug possession case that led to his 2009 probation violation. The DCHA did not present any evidence as to when Mr. Mathis's jail term began or concluded. For his part, Mr. Mathis testified that he began his jail term on August 28, 2009, but he inconsistently testified that he was incarcerated until September 28, 2009, and that he had been incarcerated for 28 days (which would have made his release date September 25, 2009), suggesting that he was unsure of the precise date range. Without explanation, the Hearing Officer stated in her findings of fact that Mr. Mathis was incarcerated from August 28, 2009, through September 24, 2009.

this happened," but then "was locked up."[11] Mr. Mathis denied giving anyone permission to stay in his apartment. He explained in his opening statement that "somebody broke into [his] apartment . . . while [he] was gone," and he subsequently testified that he had given Mr. Ratchford (who Mr. Mathis said was his cousin) his keys and let Mr. Ratchford "come down and check . . . on the unit for [him]."[12] Mr. Mathis testified that he had tried to get Mr. Ratchford to come to the hearing, but had been unsuccessful.[13]

The Hearing Officer issued a written "Informal Hearing Decision" upholding the DCHA's decision to terminate Mr. Mathis's voucher. In her findings of fact, she determined that there was no evidence that Mr. Mathis had personally engaged in any drug-related criminal activity in the 36th Street

---

[11]  By the time he received his termination notice in October 2009, Mr. Mathis had moved to a new apartment.

[12]  Mr. Mathis's testimony as to how and when he delivered the keys is unclear, in large part because of poor transcription of the hearing. At one point, the DCHA counsel asked him, "[s]o did you give them keys to your unit?" Mr. Mathis responded "[y]eah, I (inaudible) to check on my house"; but when the Hearing Officer asked him to "say that again," Mr. Mathis said "([i]naudible) because I didn't have keys. After he got arrested and they took the – took the apartment from, so I (inaudible) my keys (inaudible)."

[13]  This is another portion of the transcript where much of what was said is "inaudible," but the Hearing Officer later stated in her Informal Hearing Decision that Mr. Mathis had stated that he had difficulty "track[ing] [Mr. Ratchford] down because he did not know where [Mr.] Ratchford live[d]."

apartment on September 11, 2009, and that the allegation in the notice of termination that he had been arrested at his residence was "not accurate." The Hearing Officer also found that "it [was] somewhat of a leap to assume that [Mr.] Mathis necessarily knew that [Mr.] Ratchford was selling drugs from [Mr.] Mathis'[s] apartment"; and that not only was Mr. Mathis "in jail" at the time "and clearly not directly involved," but also that the record evidence was consistent with his testimony that "he was trying to leave the drug-infested building prior to" this incident.

The Hearing Officer noted that Mr. Mathis's voucher could nevertheless be terminated if Mr. Ratchford had exceeded the thirty-day time limit to stay in Mr. Mathis's apartment as a visitor, thus becoming "a member of [Mr. Mathis's] household," such that Mr. Mathis could be held liable for his conduct.

The Hearing Officer acknowledged that "[n]o evidence was presented by either party to establish whether [Mr.] Ratchford's presence in the unit exceeded the duration permitted for visitors," by which the Hearing Officer appeared to mean "no direct evidence" had been presented. The Hearing Officer looked to circumstantial evidence, which it identified as the fact that Mr. Mathis "a) admitted he is unaware of any known address for [Mr.] Ratchford, b) acknowledged giving

his apartment key to [Mr.] Ratchford, c) was aware of the chronic illegal activity in his building and had reported the same to his landlord, and d) had been burglarized." The Hearing Officer determined that this evidence supported a finding that Mr. Mathis "did expect [Mr.] Ratchford to stay in the unit to protect his property during [his] month-long absence." The Hearing Officer further relied on the September 11, 2009, "police report [that] indicates that [Mr.] Ratchford furnished [Mr. Mathis's] address as his own" to make a finding that Mr. Ratchford was an "unauthorized occupant."

The Hearing Officer concluded that Mr. Mathis could be "deemed liable for the actions of individuals related to him and their behavior in or around his federally assisted unit," and that "[b]ased on . . . the activity of his guests (with or without his knowledge and consent)," the DCHA had proved "by a preponderance of the evidence that [Mr.] Mathis ha[d] violated his family obligation." Accordingly, the Hearing Officer recommended affirming the DCHA's decision to terminate Mr. Mathis's participation in HCVP.

With the Informal Hearing Decision, Mr. Mathis was given notice that he had two weeks to exercise his right to review within the agency. Mr. Mathis

timely exercised that right but gained no relief.[14]  Nine months later, on February 14, 2011, the Executive Director of the DCHA issued a three-page decision entitled the "Final Informal Hearing of the District of Columbia Housing Authority," affirming the termination of Mr. Mathis's participation in HCVP.[15]

> In this final agency decision, The Executive Director noted that
>
> [t]he Hearing Officer found that Mr. Mathis'[s] relative was an unauthorized family member as defined by the [Administrative P]lan because, among other reasons: Mr. Mathis admitted that he gave his relative a key to gain entry to his residence to stay in the unit while he was incarcerated, and Mr. Mathis was unaware of any other known address for his relative.

Because "it appear[ed] that [Mr. Mathis's] relative resided in the home longer than the 30-day period guests are afforded," the Executive Director determined that "the Hearing Officer did not err in finding that Mr. Mathis['s]" relative was "an unauthorized occupant."

---

[14]  Mr. Mathis sent a letter requesting further review; in addition, his case manager at Community Connections wrote the DCHA Officer of Fair Hearings.  In this letter, the case manager explained that Mr. Mathis had "co-occurring disorders" of mental illness and substance abuse and was currently receiving treatment.  The case manager provided her contact information and expressed a hope "that th[e] information will have some bearing on the outcome of the decision to terminate" Mr. Mathis's participation in the HCVP.

[15]  *See* 14 DCMR § 8905.4 ("In the event of a request for [a] final decision by the Executive Director, the Executive Director will render a final written decision . . . ."); *see also* 14 DCMR § 8905.3 (Hearing Officer's decision will not "become final" if "one of the parties . . . request[s] the Executive Director to reconsider the proposed decision before issuing a final decision").

Moreover, the Executive Director determined that, because "Mr. Mathis'[s] relative was an unauthorized family member," the Hearing Officer properly determined that Mr. Mathis could be held accountable for that relative's drug-related criminal activity. The Executive Director stated that this was so whether or not Mr. Mathis was aware of this activity, because a HCVP participant is strictly liable for criminal drug activity by household members under 24 C.F.R. § 982.551 (l). In addition, the Executive Director reasoned that in light of Mr. Mathis's "admi[ssion] that he was aware of the drug activity taking place in his building, . . . it follows that he was or should have be well aware that his relative was also engaging in illegal activity before he was arrested."

The Executive Director's final agency decision contained a notice at the bottom informing Mr. Mathis it was "not precedent setting for [the] DCHA or the courts and cases thereafter taken to the Superior Court of the District of Columbia are de novo, are not an appeal of an administrative decision, and are not based on the record of the informal hearing." A cover letter accompanying this decision further informed Mr. Mathis that "[t]his decision [did] not affect [his] right to due process through the judicial system."

Notwithstanding the receipt of this "final" decision, Mr. Mathis immediately sought further review within the agency. In a letter addressed to the DCHA Office of Fair Hearings, he asked to "appeal the decision" he had just received, noting that he "struggle[d] with mental health problems as well as past drug abuse." Mr. Mathis asked the DCHA to "send all paperwork regarding this matter to [his] case manager . . . at the contact information below in order to keep track of the information better." Ignoring this request, the DCHA mailed a letter only to Mr. Mathis informing him that the agency's decision was final and that he was not entitled to further administrative review, but that "this decision does not affect your rights to due process through the judicial system."

Then nothing happened. More than two years passed during which time DCHA continued to pay Mr. Mathis's housing benefits without further communication to Mr. Mathis. It was not until April 2013 that DCHA sent Mr. Mathis a notice advising him that, based on the "DCHA's Final Decision on your Informal Hearing . . . on 2/15/11[,] . . . [y]our assistance will be terminated effective May, 31 2013." The notice concluded that "[t]his decision is final and no further appeals are afforded to you by the [DCHA]."

Mr. Mathis responded to this development by filing a *pro se* complaint in Superior Court seeking "[t]o overturn termination of houseing [sic] voucher on 5-31-13." At the only hearing in this matter,[16] the Superior Court immediately expressed skepticism that it had authority to vacate an administrative decision that Mr. Mathis had not appealed. Mr. Mathis tried to explain that he had pursued an appeal with DCHA and he "thought [he] was doing the right thing," by coming to Superior Court. Meanwhile, counsel for the DCHA stated that it was her understanding that Mr. Mathis "could get a de novo review with the Superior Court." After much back and forth between the court and Mr. Mathis in which it became clear that Mr. Mathis had limited ability to advocate for himself,[17] the court continued the case to give Mr. Mathis time to try to find counsel.

DCHA subsequently moved to dismiss Mr. Mathis's *pro se* complaint under Super. Ct. Civ. R. 12 (b)(6) for failure to state a claim. The Superior Court granted

---

[16] The hearing was ostensibly for the court to consider Mr. Mathis's request for a temporary restraining order (TRO), but Mr. Mathis had to ask the court what a TRO was.

[17] Mr. Mathis mentioned at the hearing that he was receiving "SSI" benefits, i.e. Supplemental Security Income benefits, a federal income supplement for financially eligible individuals who are elderly or have a disability. He also indicated that he wanted his "mental health people [to] get involved" and (again) requested that DCHA communicate with his "case worker."

the motion and in addition ruled that "jurisdiction over appeals from decisions on contested matters from the [DCHA] is vested in the District of Columbia Court of Appeals," citing the DCAPA and *Powell v. District of Columbia Housing Authority*, 818 A.2d 188 (D.C. 2003). This appeal followed.

## II. Jurisdictional Issues

This case comes to us as an appeal from Superior Court; that is where the DCHA indicated Mr. Mathis should go when it notified him, pursuant to 14 DCMR § 8905.4 (a), of his right to seek judicial review of the Executive Director's final agency decision to terminate his housing voucher. This notice notwithstanding, the Superior Court determined that it did not have jurisdiction to hear Mr. Mathis's original action because, under the DCAPA, this court has exclusive jurisdiction whenever an individual seeks judicial review of an agency decision arising out of a "contested case." In an unusual turn, Mr. Mathis and the DCHA filed initial briefs in this court in which they both argued that the Superior

Court was incorrect, and Mr. Mathis's case should be remanded to Superior Court to allow him to litigate his case.[18]

This court ordered supplemental briefing. Mr. Mathis argued in his supplemental brief that this case was a contested case, properly routed directly to this court under the DCAPA, and he subsequently filed a petition for review of the DCHA's decision with this court. For its part, the DCHA continued to maintain in its supplemental brief that it had properly directed Mr. Mathis to Superior Court to seek judicial review of its voucher termination decision, but at oral argument it conceded that this was a contested case "for purposes of the Administrative Procedure Act and this court's appellate jurisdiction."

---

[18] Mr. Mathis acknowledged in his initial brief that "the contention that [the Court of Appeals] has jurisdiction over DCHA appeals has considerable force" because the "DCHA's 'informal hearings' regarding voucher terminations have all the hallmarks of 'contested cases' under the [DCAPA]." But this avenue appeared closed to Mr. Mathis in light of a series of unpublished decisions by this court relying on 14 DCMR § 8905.4 (a) and holding that the DCHA hearings were not contested cases. Mr. Mathis observed that, lest the agency be left to operate without any judicial oversight, he had to be able to seek judicial review somewhere. *See District of Columbia Housing Authority v. District of Columbia Office of Human Rights*, 881 A.2d 600, 608 (D.C. 2005) ("A strong presumption exists in favor of judicial reviewability which may be rebutted only by clear and convincing evidence of a contrary legislative intent." (quoting *Martin v. District of Columbia Courts*, 753 A.2d 987, 991 (D.C. 2000))). The only viable forum appeared to be Superior Court.

This court has an independent obligation to confirm our jurisdiction, or lack thereof, to hear an appeal from Superior Court and/or to entertain a petition for review of an agency's decision. *See Nunnally v. District of Columbia Metro. Police Dep't*, 80 A.3d 1004, 1006 n.4 (D.C. 2013) (citing *Murphy v. McCloud*, 650 A.2d 202, 203 n.4 (D.C. 1994)). We now examine (1) whether this is a contested case and (2) whether we may consider Mr. Mathis's untimely petition for review so that we may reach the merits of his challenge to the DCHA's voucher termination decision.

### A. *Whether the DCHA Administrative Proceedings Are Contested Cases under the DCAPA*

Whether a case is "contested" and thus properly routed directly to this court under the DCAPA is a question of law that we review *de novo*. *See American University in Dubai v. District of Columbia Educ. Licensure Comm'n*, 930 A.2d 200, 207 & n.17 (D.C. 2007).

In the District of Columbia, "[a]ny person suffering a legal wrong, or adversely affected or aggrieved, by an order or decision of . . . an agency in a contested case, is entitled to a judicial review thereof . . . upon filing in the District of Columbia Court of Appeals a written petition for review." D.C. Code § 2-510

(a); *see* D.C. Code § 11-722 (2012 Repl.) ("The District of Columbia Court of Appeals has jurisdiction . . . to review orders and decisions of . . . any agency of the District of Columbia . . . in accordance with the [DCAPA].").  "Where the agency proceeding meets the definition of a 'contested case,' judicial review is exclusively in the District of Columbia Court of Appeals, not the Superior Court of the District of Columbia."  *Ne. Neighbors for Responsible Growth, Inc. v. AppleTree Inst. for Educ. Innovation, Inc.*, 92 A.3d 1114, 1121 (D.C. 2014); *accord*, *2348 Ainger Place Tenants Ass'n, Inc. v. District of Columbia*, 982 A.2d 305, 308 (D.C. 2009) ("Where the [DCAPA] vests exclusive jurisdiction in this court over review of administrative actions, the Superior Court may not maintain concurrent jurisdiction.").

The DCAPA defines a "contested case" as "a proceeding before . . . any agency in which the legal rights, duties, or privileges of specific parties are required by any law (other than this subchapter), or by constitutional right, to be determined after a hearing before the Mayor or before an agency."  D.C. Code § 2-502 (8) (2012 Repl.).  This court has distilled that definition into a two-part test:  A "contested case" is (1) "a controversy involving a 'trial-type' hearing that is required" by the agency's enabling statute, its implementing regulations, or constitutional right, and (2) which is an "adjudicative, as opposed to a legislative,

determination." *Powell*, 818 A.2d at 192-93 (citing *Donnelly Assoc. v. District of Columbia Historic Preservation Review Bd.*, 520 A.2d 270, 276 (D.C. 1987); quoting *Rones v. District of Columbia Dep't of Housing & Community Dev.*, 500 A.2d 998, 1000 (D.C. 1985)).

Mr. Mathis's informal hearing before the DCHA concerned only the propriety of the termination of his benefits and was indisputably adjudicative. *See Powell*, 818 A.2d at 193 (explaining that an adjudicative determination assesses "the rights of specific individuals" (quoting *Donnelly*, 520 A.2d at 278)). So the only question we need closely consider is whether Mr. Mathis was legally entitled to a "trial-type" hearing. *Cf. id.* at 193 n.7 (explaining that whether an individual in fact receives a trial-type hearing is "irrelevant"; the only question is legal entitlement). We conclude that he was.

As we recognized in *Powell*, a trial-type hearing is one that incorporates "due process protections such as representation by counsel, cross-examination of adverse witnesses, [and] fact-finding by an impartial adjudicator." *Id.* at 193. The right to obtain pre-hearing discovery, and to make opening and closing arguments are "other accoutrements of a trial-type hearing." *See id.* Pursuant to federal and

District of Columbia law, Mr. Mathis was entitled to all of these procedural protections at his hearing before the DCHA.

Pursuant to federal statute, any PHA receiving funds for the HCVP program such as the DCHA "shall by regulation . . . establish and implement an administrative grievance procedure under which tenants" must be given notice "of the specific grounds of any proposed adverse public housing agency action" and "an opportunity for a hearing before an impartial party upon timely request." *See* 42 U.S.C. § 1437d (k), (k)(1)-(2) (2013). In conjunction with that hearing, the tenant must be given "an opportunity to examine any documents or records or regulations related to the proposed action." *Id.* at § 1437d (k)(3). And at that proceeding, the tenant is "entitled to be represented by another person of their choice at any hearing; . . . to ask questions of witnesses and have others make statements on their behalf; and . . . to receive a written decision by the public housing agency on the proposed action." *Id.* at § 1437d (k)(4)-(6).

Federal regulations reinforce that so-called "informal hearings" are required when a PHA seeks to terminate a HCVP participant's voucher "because of the family's action or failure to act," 24 C.F.R. § 982.555 (a)(1)(iv) (2015); *see* 24 C.F.R. § 982.555 (a)(2), and specify a tenant's procedural protections at such

hearings: a tenant has a right to examine relevant documents before the hearing, to be represented by counsel, to have the case heard by someone other than a person who made or approved the decision under review or a subordinate of this person, to present evidence, and to question witnesses. *See id.* at § 982.555 (e)(2)-(5). These regulations also provide that the individual who conducts the hearing "must issue a written decision," stating the reasons therefor and using a preponderance of the evidence standard for factual determinations. *Id.* at § 982.555 (e)(6).

Finally, DCHA regulations conform to federal statutory and regulatory requirements. *See* 14 DCMR § 8902.1 (j) (2009) (notice and a hearing must be provided when the agency seeks to "[t]erminat[e] . . . assistance for any reason"); 14 DCMR § 8903.4 (b) (2013) (prehearing discovery is required); 14 DCMR § 8904.1 (a)-(d) (2005) (at a hearing, a tenant has a right to examine documents, to be represented by counsel, to present evidence and question witnesses, and to make "written or oral objections to the DCHA's determination"); 14 DCMR § 8904.3 (a hearing must be held before an impartial adjudicator); 14 DCMR § 8904.4 (a) (hearing "shall concern only the issues for which the [tenant] has received notice in

conformance with subsection 8901.3");[19] 14 DCMR § 8905.1-8905.4 (requiring a written decision by a Hearing Officer or, if further agency review is sought, by the Executive Director).

Having determined that Mr. Mathis was legally entitled to an adjudicative, trial-type hearing, we conclude that the test for what constitutes a contested case deserving of this court's review has been met in this case. There is the matter, however, of 14 DCMR § 8905.4 (a), which directs DCHA to give notice to HCVP participants that a final adverse decision by the DCHA is "not precedent setting for DCHA or the courts and cases thereafter taken to Superior Court . . . are [to] be tried de novo." The DCAPA excludes from the definition of "contested case" "[a]ny matter subject to a subsequent trial of the law and the facts de novo in any court." D.C. Code § 2-502 (8)(A). But we do not construe 14 DCMR § 8905.4 (a), an agency regulation, as purporting to confer upon Superior Court jurisdiction over cases that would otherwise come to this court, an action that would seem to far exceed the DCHA's authority.[20] Rather, like the parties, we interpret this

---

[19] The reference to subsection 8901.3 is in error as there is no such subsection; the correct citation appears to be 14 DCMR § 8903.1, which addresses notice requirements.

[20] Congress retains exclusive legislative authority to define the jurisdiction of the District of Columbia courts, D.C. Code § 1-206.02 (a)(4) (2012 Repl.), and (continued . . .)

regulation merely to direct that notice of judicial review be provided. We highlight that the regulation requires the DCHA to supply HCVP participants with incorrect or at least misleading information, *see infra* at Part II.B.2, and we trust that the agency will amend it without delay.

### B. Whether this Court has the Authority to Entertain Mr. Mathis's Untimely Petition for Review and Reach the Merits of His Case

Because this case was a contested case, it should not have been routed through Superior Court, and we affirm the Superior Court's determination that it lacked jurisdiction. But that does not end our analysis. During the pendency of this appeal, Mr. Mathis filed a petition for review of DCHA's voucher termination decision pursuant to D.C. App. R. 15 (a)(2) ("Rule 15"). Rule 15 generally requires a petition for review to be filed within thirty days of notice of the adverse

---

( . . . continued)

in the DCAPA, Congress directed that contested cases from agency proceedings be routed to this court. D.C. Code § 2-510 (a); *see AppleTree Inst*., 92 A.3d at 1121 ("Where the agency proceeding meets the definition of a 'contested case,' judicial review is exclusively in the District of Columbia Court of Appeals, not the Superior Court of the District of Columbia.").

Meanwhile, the DCHA's enabling statute limits its power to "adopt and implement administrative procedures" by stating that they "shall be in compliance with [the DCAPA]," D.C. Code § 6-203 (12) (2012 Repl.), and specifies that DCHA's "[e]xercise" of "power" cannot "conflict with the laws of the District," such as the DCAPA, *id*. at § 6-203 (22).

decision. Thus, we must examine whether the timing requirements of Rule 15 may be equitably tolled and, if so, whether equitable tolling is warranted in this case.

### 1. Whether the Timing Requirement of Rule 15 May Be Equitably Tolled

Whether the timing requirements of Rule 15 may be equitably tolled turns on whether the rule is a "jurisdictional" rule or a "claim-processing" one. Jurisdictional rules may not be tolled, because noncompliance deprives this court of jurisdiction even to consider equitable arguments; claim-processing rules, on the other hand, may be tolled if equity compels such a result. *See Neill v. District of Columbia Public Employee Relations Bd.*, 93 A.3d 229, 238 (D.C. 2014), (explaining that claim-processing rules "may be relaxed or waived").[21]

---

[21] The DCHA has never addressed, much less contested, the propriety of equitable tolling in this case even though Mr. Mathis argued in his initial brief to this court that, if judicial review of the DCHA's decision terminating his voucher should have been sought in this court, this court should equitably toll Rule 15's thirty-day filing deadline. We may not treat this issue as conceded, however, because of its jurisdictional implications. "Where a substantial question exists as to this court's subject matter jurisdiction, it is our obligation to raise it, *sua sponte,* even though, as here, no party has asked us to consider it." *Neill*, 93 A.3d at 237 n.35 (quoting *In re D.M.*, 771 A.2d 360, 364 (D.C. 2001)).

The dividing line between jurisdictional and claim-processing rules has been in flux over the last decade. The Supreme Court, whose jurisprudence on this issue we follow,[22] has made clear that "a rule should not be referred to as jurisdictional unless it governs a court's adjudicatory capacity, that is, its subject-matter or personal jurisdiction." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435 (2011). Furthermore, the Court has made clear that stringent requirements must be satisfied for a rule to have the effect of automatically stripping a court of "jurisdiction" in this sense.

Preliminarily, the Supreme Court has clarified that only a statute and not court rules may alter the "classes of cases . . . falling within a court's adjudicatory authority." *Kontrick v. Ryan*, 540 U.S. 443, 452-53, 455 (2004); *accord Bowles v. Russell*, 551 U.S. 205, 210 (2007) ("[B]ecause '[o]nly Congress may determine a lower federal court's subject-matter jurisdiction,' it was improper for courts to use 'the term jurisdictional to describe emphatic time prescriptions in rules of court.'" (internal citations omitted) (quoting *Kontrick*, 540 U.S. at 452, 454)).

---

[22] *See, e.g., Gatewood v. District of Columbia Water & Sewer Authority*, 82 A.3d 41, 47 (D.C. 2013); *Smith v. United States*, 984 A.2d 196, 200-01 (D.C. 2009).

Even more recently, in *Sebelius v. Auburn Regional Med. Ctr*., 133 S. Ct. 817, 824 (2013) and *United States v. Kwai Fun Wong*, 135 S. Ct. 1625, 1632 (2015), the Supreme Court has made clear that the modern "bright line" default, *Auburn*, 133 S. Ct. at 824, is that procedural rules, even those codified in statutes, are "nonjurisdictional in character." *Id.* (quoting *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 515-16 (2006)). Filing deadlines in particular are "'quintessential claim-processing rules,'" which 'seek [only] to promote the orderly progress of litigation,'" and generally do not have jurisdictional force. *Wong,* 135 S. Ct. at 1632 (quoting *Henderson*, 562 U.S. at 435). Such rules "cabin a court's power only if Congress has 'clearly state[d]' as much." *Wong*, 135 S. Ct. at 1632 (quoting *Auburn*, 133 S. Ct. at 824). In order to "imbue[] a procedural bar with jurisdictional consequences," the legislature "must do something special." *Id*. It is not enough that the legislature articulated the deadline using "mandatory" language. *Id*. Rather, a deadline is not jurisdictional unless "traditional tools of statutory construction [] *plainly show*" that the legislature meant for noncompliance with the deadline to have jurisdictional consequences. *Id.* (emphasis added); *see Auburn*, 133 S. Ct. at 824 (explaining that courts must inquire whether the legislature "has 'clearly state[d]' that the rule is jurisdictional").

This court has since endorsed this "bright line" divide between jurisdictional and claim-processing rules. *Neill*, 93 A.3d at 238 n.37 (citing *Auburn* for the proposition "that even statutory restrictions governing the cases courts may hear are not to be deemed jurisdictional unless the intent of the legislature is clear"); *Gatewood*, 82 A.3d at 47 (explaining that this court's "more nuanced examination" of whether a rule "is truly jurisdictional or merely a 'claim-processing' rule" is grounded in "recent Supreme Court decisions" including *Auburn*). But in the midst of this sea change in how Supreme Court delimits jurisdictional rules—after *Kontrick* (2004), *Bowles* (2007), and *Henderson* (2011), but before *Auburn* (2013) and *Wong* (2015)—this court decided *Capitol Hill Restoration Society v. District of Columbia Mayor's Agent for Historic Preservation*, 44 A.3d 271 (D.C. 2012), addressing whether the timing requirements of Rule 15 could be equitably tolled. Acknowledging the issue was subject to "some question," *id*. at 277, this court concluded that Rule 15 could not be equitably tolled because it was a jurisdictional rule. *Id*. We reasoned that because "the applicable provision of the [DC]APA . . . provides that '[a] petition for review *shall* be filed in such Court within such time as such Court may by rule prescribe,' D.C. Code § 2-510 (a) (emphasis added), the time for appeal provided in Rule 15 acquires the force of a statutory jurisdictional mandate." *Id*.

In deciding *Capitol Hill Restoration Society*, we did not anticipate *Auburn* or *Wong*, and our characterization of Rule 15 as a jurisdictional rule cannot be squared with those decisions. As discussed above, *see supra* at Part II.A, D.C. Code § 2-510 (a) of the DCAPA generally provides that this court has exclusive jurisdiction to review contested cases. These jurisdictional provisions are located in the first sentence of § 2-510 (a), assigning review of contested cases to this court,[23] and in the sixth sentence of § 2-510 (a), providing that "[u]pon the filing of a petition for review, the Court shall have jurisdiction of the proceeding."[24] Notably, the sixth sentence does not require the filing of a "timely" petition for jurisdiction to attach.

Meanwhile, the timing provision in the fourth sentence of § 2-510 (a) gives no indication that it has jurisdictional import. It states simply that a "petition for review shall be filed in such Court *within such time as such Court may by rule prescribe . . . .*" D.C. Code § 2-510 (a) (emphasis added). Under *Auburn* and *Wong*, this language does not "imbue" Rule 15 with the force of a statutory

---

[23] D.C. Code § 2-510 (a) ("Any person suffering a legal wrong, or adversely affected or aggrieved, by an order or decision of . . . an agency in a contested case, is entitled to a judicial review thereof . . . upon filing in the District of Columbia Court of Appeals a written petition for review.").

[24] *Id.*

jurisdictional mandate. To the contrary, plainly read, the DCAPA takes no position on issues of timeliness and delegates all decisions about timeliness to our court, including, apparently, the decision to have no time limits at all. *Cf. Gatewood*, 82 A.3d at 48 (observing that "the Council for the District of Columbia did not force [the agency's internal filing deadline] upon the agency" and because "the regulation's deadline [wa]s a self-imposed restriction, [it] b[ore] the indicia of a claim-processing rule").

In the absence of a clear statement of legislative intent to make Rule 15's thirty-day filing deadline jurisdictional, as required by *Auburn* and *Wong*, we hold that this deadline is not a jurisdictional rule, that *Capitol Hill*'s pronouncement to the contrary does not bind us,[25] and that, as a claim-processing rule, Rule 15's thirty-day filing deadline is subject to equitable tolling.[26]

---

[25] "*M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971), does not oblige us to follow, inflexibly, a ruling whose jurisprudential basis has been 'substantially undermined' by subsequent Supreme Court decisions." *Smith*, 984 A.2d at 200 (citing *Lee v. United States*, 668 A.2d 822, 828 (D.C. 1995)). By departing from earlier precedent regarding the division between jurisdictional and claim-processing rules, we act consistently with our decisions in *Smith* and *Gatewood*, 82 A.3d at 47 nn.25 & 26, 48 (concluding that recent Supreme Court decisions, including *Auburn*, "substantially undermine our former approach to administrative agency deadlines").

[26] Our colleague concurring in the determination that Rule 15's filing deadline may be equitably tolled in this case argues that we should avoid (continued . . .)

( . . . continued)

overruling *Capitol Hill Restoration Society* and resolve this case on "narrower grounds," specifically, by looking to "the unique-circumstances doctrine" to decline to enforce Rule 15's thirty-day time limit. But the Supreme Court held in *Bowles* that truly jurisdictional timing rules cannot be tolled using this doctrine. 551 U.S. at 214 ("Because this Court has no authority to create equitable exceptions to jurisdictional requirements, use of the 'unique circumstances' doctrine is illegitimate."); *see also id.* (overruling two half-century-old Supreme Court decisions "to the extent they purport to authorize [this] exception to a jurisdictional rule").

Aware of *Bowles*, our colleague explains that we do not actually have to endorse and apply the unique circumstances doctrine. Instead, our colleague asserts, we can review Mr. Mathis's case even as we hold the law in a state of suspension, recognizing that either (a) the possibly defunct unique-circumstances doctrine would forgive his failure to meet a jurisdictional filing deadline, or (b) Rule 15 is not in fact a jurisdictional rule, even though we previously said it was. Our colleague's desire to actively preserve legal limbo as to a question concerning our jurisdiction is not justified by our practice of avoiding advisory opinions. Just the opposite, we have an obligation to raise jurisdictional questions, *see* note 21 *supra*, and resolve them, *see, e.g., Neill*, 93 A.3d at 239 (holding that Rule 1 addressing case captioning is only a claim processing rule, not a jurisdictional rule), because "without jurisdiction, the Court cannot proceed at all in any cause," *In re D.M.*, 771 A.2d at 364 (internal quotation and citations omitted). Furthermore even our colleague does not truly decide not to decide, because he admits that there is a possible third route forward—relying on *Bowles* to overrule the unique-circumstances doctrine while still preserving *Capitol Hill Restoration Society*'s view of Rule 15 as jurisdictional—but then determines (correctly in my view) that this route would be "doctrinally unwarranted" and "unfair."

Any debate about when this court should exercise its authority as expositor of the law is academic, however, because we have already effectively resolved the questions our colleague seeks to avoid resolving. As discussed above, *Bowles*, *Auburn*, and *Wong* are all part of the same seam of Supreme Court precedent that this court has relied upon to reconceive the divide between jurisdictional and claim-processing rules. And our reconception of that divide in accordance with Supreme Court precedent compels not only the conclusion that Rule 15 is not a jurisdictional rule, but also that the unique-circumstances doctrine cannot serve as the foundation for our decision to review Mr. Mathis's petition for review.

### 2.      *Whether Equitable Tolling is Warranted*

Whether Rule 15's thirty-day filing deadline should be tolled in this case is a fact-specific question that turns on our balancing the fairness to both parties.  We have said that "equity aids the vigilant," and have indicated that whether a timing rule should be tolled turns on whether there was unexplained or undue delay and whether tolling would work an injustice to the other party.  *Simpson v. District of Columbia Office of Human Rights*, 597 A.2d 392, 403-04 (D.C. 1991).  There is no unexplained or undue delay in this case, and we discern no prejudice to the DCHA if we were to reach the merits of Mr. Mathis's untimely filed petition for review.

Mr. Mathis's failure to file a timely petition for review after the DCHA issued its final decision is wholly attributable to the DCHA's failure to give him proper notice regarding his right to judicial review.  As we have explained, *see supra* at Part II.A, because the proceedings before the DCHA constituted a contested case, the DCHA should have informed Mr. Mathis that he had thirty days to file a petition for review directly with this court.  It did not do this.  Instead, it

gave him notice indicating that, if he wanted judicial review of the agency's decision, he would have to commence an original action in Superior Court.[27]

Demonstrating that he did want to contest the agency's decision but that he, as a *pro se* litigant, did not understand what he was supposed to do next, Mr. Mathis initially tried to internally "appeal" the DCHA's final agency decision by sending a letter to the Executive Director. In that letter, sent two weeks after the issuance of the final agency decision, he indicated that he was struggling with "mental health problems as well as past drug abuse" and he asked that "all paperwork regarding this matter" be sent to his case manager. In response, the agency sent a letter (only to Mr. Mathis) notifying him that its decision was final and giving him vague direction that he had "rights to due process through the judicial system." Again, DHCA failed to direct Mr. Mathis to this court, much less inform him of the limited timeframe to petition for review under Rule 15.

---

[27] The final sentence of the DCHA Executive Director's decision reads as follows:

> This final decision of the District of Columbia Housing Authority (DCHA) is not precedent setting for DCHA or the courts, and cases thereafter taken to the Superior Court of the District of Columbia are de novo, are not an appeal of an administrative decision, and are not based on the record of the informal hearing.

This notice tracked the language of 14 DCMR § 8905.4 (a), which we have now determined requires the agency to provide incorrect notice. *See supra* at Part II.A.

Notably, when Mr. Mathis subsequently filed a timely action in Superior Court,[28] the Superior Court judge identified its lack of jurisdiction *sua sponte*. Although the DCHA had sought to dismiss Mr. Mathis's suit, it did so not on jurisdictional grounds. Instead the DCHA invoked Rule 12 (b)(6) of the Superior Court Rules of Civil Procedure and argued that Mr. Mathis had failed in his *pro se* complaint to state a claim upon which relief could be granted. It appears (particularly in light of its briefing to this court siding with Mr. Mathis on the issue of whether the trial court properly dismissed his case for lack of jurisdiction) that the DCHA believed the Superior Court *did* have jurisdiction over Mr. Mathis's case and that he had properly and timely sought judicial review in that forum. Given that even the DCHA was confused about where Mr. Mathis could seek judicial review, we cannot fault Mr. Mathis, proceeding *pro se*, for not

---

[28] For unknown reasons, DCHA waited over two years, from February 2011 to April 2013, to notify Mr. Mathis that it would terminate his voucher payments in May 2013. It appears that receipt of this notice is what prompted Mr. Mathis to file weeks later his *pro se* complaint "[t]o overturn termination of houseing [sic] voucher on 5-31-13," and that he may have been confused that the agency was still reviewing his case. In any event, his action was still well within the applicable statute of limitations, *see District of Columbia Housing Authority*, 881 A.2d at 608-09 ("[W]here no court rule or statute specifies the time for filing a petition for review of an agency determination, the time for filing is governed by D.C. Code § 12-301 (8) [(2012 Repl.)], which provides a three-year limitations period for any action for which 'a limitation is not otherwise specially prescribed.'" (quoting *Simpson*, 597 A.2d at 400)), and we cannot say that he slept on his rights during this time.

appreciating that he had a right and an obligation to come to this court to seek judicial review within thirty days of the DCHA's final decision to terminate his voucher and for pursuing relief in Superior Court instead. *Cf. Simpson*, 597 A.2d at 402 (declining to "retroactively require [the appellant] to have obtained a crystal ball many years earlier and to have predicted . . . the development of this court's 'contested case' jurisprudence").

Nor can we identify undue or unexplained delay after Mr. Mathis obtained counsel to assist him in his appeal of the Superior Court's order dismissing his case. To the contrary, it was counsel for Mr. Mathis who alerted this court in its initial brief to the fact that the "DCHA's 'informal hearings' regarding voucher terminations have all the hallmarks of 'contested cases' under the [DCAPA]" and so noted that the contention that Mr. Mathis's case should have come directly to this court had "considerable force." But counsel also noted that this court had issued a number of unpublished decisions holding otherwise. Thus, counsel reasonably argued in Mr. Mathis's initial brief (as did the DCHA) that the Superior Court was wrong and that Mr. Mathis had properly filed an original action in Superior Court. Even so, counsel argued that if this court in fact had jurisdiction to review the DCHA's informal hearings directly, then we "should permit Mr. Mathis to petition for appellate review." And, as soon as it became clear that there was a

possibility that this court might hold (as it now does) that this case was a contested case, counsel for Mr. Mathis filed a petition for review.

In sum, Mr. Mathis has diligently sought to challenge the DCHA's decision since the time it was issued. The notice the DCHA provided him about his right to judicial review was at best ambiguous and at worst misleading.[29] Mr. Mathis pursued the only avenue that he reasonably understood was available to him: to go to Superior Court. And as soon as he became aware that this court's direct review of the agency's decision was a possibility, he filed a petition for review.

On the other side of the ledger, we discern no prejudice that would flow to the DCHA if we were to toll Rule 15's timing requirement and reach the merits of this case. The DCHA fully briefed and argued the merits issue in supplemental briefing and at a second oral argument. At no time did it indicate it had been hampered in doing so by the passage of time.

---

[29] *See Capitol Hill*, 44 A.3d at 277 (explaining that "[i]n those cases where we have applied the principle of construing ambiguity against the agency, the ambiguity . . . has been attributable to some action on the part of the agency that misled the appellant").

Accordingly, we conclude that it is appropriate under the circumstances to equitably toll the deadline under Rule 15 for Mr. Mathis to file a petition for review.

## III.    The Propriety of the DCHA's Voucher Termination Decision

Having resolved that this court is the proper forum for review of the Executive Director's final agency decision to terminate Mr. Mathis's voucher and that we can and should consider his untimely petition for review of that decision, we turn to the merits of Mr. Mathis's petition.  Mr. Mathis makes two arguments: (1) the Executive Director's decision that Mr. Ratchford was an unauthorized household member was not supported by the factual findings made by the DCHA Hearing Officer, and (2) the Executive Director terminated Mr. Mathis based on conduct (by Mr. Ratchford) not included in the notice of termination.  Because we agree with Mr. Mathis's first argument, we do not address the second.

This court's review in contested cases of agency decision-making is generally deferential.  When a challenge is made to the evidentiary basis for an agency's decision-making, "[a]n agency's findings of fact are conclusive on this court unless unsupported by substantial evidence in the record." *Proulx v. Police*

*& Firemen's Ret. & Relief Bd.*, 430 A.2d 34, 35 (D.C. 1981) (internal quotation marks omitted); D.C. Code § 2-510 (a)(3)(E) (directing this court to examine whether the agency decision is "[u]nsupported by substantial evidence in the record"). We have previously explained that "[s]ubstantial evidence is relevant evidence such as a reasonable mind might accept as adequate to support a conclusion." *District of Columbia Appleseed Ctr. for Law & Justice, Inc. v. District of Columbia Dep't of Ins., Sec., & Banking*, 54 A.3d 1188, 1216 (D.C. 2012) (internal quotation marks omitted).

In the DCHA's final decision, the Executive Director determined that Mr. Mathis's voucher could be terminated both because he had an "unauthorized family member" living with him and because he was responsible for Mr. Ratchford's drug-related criminal activity,[30] which required a showing that Mr.

---

[30] It is unclear whether the DCHA presented sufficient evidence that Mr. Ratchford engaged in "drug-related criminal activity," a term of art under the Administrative Plan which refers to "felonious" conduct. *See* ADMIN. PLAN, Ch. 17 at 103; *supra* note 1. It appears from his arrest report that Mr. Ratchford was only arrested with one count of misdemeanor possession of heroin; and, although the return on the search warrant of Mr. Mathis's apartment indicated that the police recovered one ziploc bag containing crack cocaine and one ziploc bag containing heroin, no indication is given as to the size or weight of the bags. We bypass this issue, however, since we determine that the DCHA presented insufficient evidence to establish that Mr. Mathis could be held responsible for Mr. Ratchford's conduct, whatever its gravity.

Ratchford had acquired status as a "family" or "household" member.[31] To establish that Mr. Ratchford was an unauthorized "family" or "household" member, the DCHA had to show by a preponderance of the evidence[32] that Mr. Ratchford had stayed in Mr. Mathis's apartment for more than thirty days. The Hearing Officer, who bore the responsibility to resolve factual disputes and make the necessary factual findings for the agency,[33] did not make such a finding, it appears, because she could not.

---

[31] *See* 24 C.F.R. § 982.551 (l) ("The *members of the household* may not engage in drug-related criminal activity . . . .") (emphasis added); 24 C.F.R. § 982.553 (b)(1)(i)(A) (termination of HCVP assistance permitted if "[a]ny *household member* is currently engaged in any illegal use of a drug") (emphasis added); 24 C.F.R. § 982.553 (c) ("The PHA may terminate assistance for criminal activity by a *household member* . . . .") (emphasis added); *see also* ADMIN. PLAN, Ch. 17, at 103 ("*Family* must not engage in drug-related criminal activity.") (emphasis added).

[32] *See* D.C. Code § 2-509 (b) (2012 Repl.) ("In contested cases . . . the proponent of a rule or order shall have the burden of proof."); ADMIN. PLAN, Ch. 17, at 104-05 (setting forth a preponderance standard for the DCHA's denial or termination of assistance decisions); *see also* 24 C.F.R. § 982.555 (e)(6) ("Factual determinations relating to the individual circumstances of the family shall be based on a preponderance of the evidence presented at the hearing.").

[33] 14 DCMR § 8905.1 (b) (requiring the Hearing Officer to make "[f]actual determinations relating to the individual circumstances of the participant or applicant based on a preponderance of the evidence and testimony presented at the informal hearing"); 14 DCMR § 8905.4 (assigning reviewing authority to the Executive Director but not the power to make new factual findings).

The Hearing Officer imprecisely determined that Mr. Ratchford was an "unauthorized occupant" based on the fact that Mr. Mathis's address was listed as Mr. Ratchford's home address on Mr. Ratchford's arrest report. But, even if Mr. Ratchford told the police on the day of his arrest that he lived there (*but see* note 8 *supra*), that statement did not resolve whether Mr. Ratchford had been residing in the apartment for more than thirty days. The Hearing Officer also determined only that there was circumstantial evidence that Mr. Mathis "*expect*[*ed*]" Mr. Ratchford to stay in his apartment for a month. (emphasis added). Mr. Mathis's expectations were hardly dispositive, but in any event the Hearing Officer's four-point foundation for her findings about those expectations was flawed and did not establish that Mr. Ratchford resided in Mr. Mathis's apartment for over thirty days so as to become an unauthorized family or household member.[34]

First, the Hearing Officer noted that Mr. Mathis "admitted he is unaware of any known address for [Mr.] Ratchford," the implication being that he must have known that Mr. Ratchford was using his apartment as his own residence because

---

[34] The Executive Director seemed to think that two of these points had served as adequate foundation for the Hearing Officer's conclusion that Mr. Ratchford had resided in Mr. Mathis's apartment for more than thirty days and thus that he was an "unauthorized family member." As we explain, they did not and could not.

he knew that Mr. Ratchford had no other.  But when Mr. Mathis indicated that he did not know where Mr. Ratchford lived, he was referring to the state of his knowledge at the time of the hearing in April 2010, seven months after Mr. Ratchford's arrest and after Mr. Mathis had moved to a different apartment:  he was explaining why he had been unable to get Mr. Ratchford to come to the hearing to testify.  *See supra* note 13.  This "unaware[ness] of any known address for [Mr.] Ratchford" had no bearing on whether Mr. Ratchford stayed in Mr. Mathis's apartment for more than thirty days in the fall of 2009.

Second, the Hearing Officer noted that Mr. Mathis had given Mr. Ratchford a key, but this fact would not establish that Mr. Ratchford had resided in Mr. Mathis's apartment for more than thirty days.  At the very least, there would need to be evidence as to when the key was conveyed such that one could discern when Mr. Ratchford first gained entry.  There was none.  At oral argument, counsel for the DCHA suggested that Mr. Mathis must have given Mr. Ratchford a key before he began the jail term for his probation violation, but at Mr. Mathis's hearing, in an otherwise poorly-transcribed response to the question, "[s]o did you give them [the] keys to your unit," Mr. Mathis testified clearly that "I didn't have keys."

Third and fourth, the Hearing Officer noted that Mr. Mathis "was aware of the chronic illegal activity in his building and had reported the same to his landlord," and that he "had been burglarized." But the fact that Mr. Mathis had reason to be concerned about the security of his apartment did not establish that he expected Mr. Ratchford to live there for more than thirty days and was consistent with his explanation that he had asked Mr. Ratchford to check on his apartment while he was in jail.

In short, the Hearing Officer did not identify any sound reasons for a determination that Mr. Ratchford had in fact resided in Mr. Mathis's apartment for more than thirty days, thus making him an unauthorized family or household member for whose conduct Mr. Mathis could be held accountable. Indeed, implicitly conceding that she lacked the evidentiary foundation to make this determination, she ultimately punted on this critical finding of fact: Even as the Hearing Officer determined that Mr. Mathis had "violated his family obligations" based on Mr. Ratchford's "activity," she described Mr. Ratchford as a "guest[]" in Mr. Mathis's apartment, instead of classifying him a "household" or "family" member.

For our part, examining the record as a whole, we cannot see a substantial, reasonable basis for a determination that Mr. Ratchford resided in Mr. Mathis's apartment for more than thirty days and thus became a "household" or "family" member for whom Mr. Mathis became responsible. There is evidence that Mr. Ratchford was arrested at Mr. Mathis's apartment on September 11, 2009.[35] And there is evidence that the DCHA investigator later saw Mr. Ratchford at the apartment on October 7, 2009.[36] But even if one were to assume Mr. Ratchford continuously resided in the apartment between those dates (which presumably he did not, given his September 11 arrest), that does not add up to thirty days.

Because the DCHA's determination that Mr. Ratchford was an "unauthorized family member" was not supported by the agency's factual findings or substantial evidence in the record, the agency lacked a valid foundation for

---

[35] Drugs were purchased from the apartment before that date, but it is unclear when and the identity of the seller is unknown. *See supra* note 7. Certainly there is no evidence that Mr. Ratchford was present, much less residing, at the apartment before Mr. Mathis commenced his jail term for his probation violation, and thus there is no factual foundation for the Executive Director's determination that Mr. Mathis should have connected Mr. Ratchford to criminal drug activity in Mr. Mathis's building from that earlier time.

[36] Mr. Mathis's subsequent conversation with the investigator on October 13, 2009, about Mr. Ratchford's presence in his apartment does not support a determination that Mr. Ratchford resided there for more than 30 days. The hearing officer found that Mr. Mathis had only (vaguely) "acknowledged that his brother did stay with him from time to time." *See* note 9 *supra*.

terminating Mr. Mathis's voucher. We thus reverse that termination decision and remand to the DCHA for Mr. Mathis's housing benefits to be reinstated.

*So ordered.*

MCLEESE, *Associate Judge*, concurring in part and dissenting in part: I agree that the proceeding before the District of Columbia Housing Authority (DCHA) in this case was a contested case and that the DCHA's ruling is properly reviewed in this court. I therefore join Part II.A. of the opinion for the court.

I also agree that Mr. Mathis's petition for review is not time-barred, but I would rest that conclusion on narrower grounds. The opinion for the court holds that the time limits applicable to petitions for review in this court are not jurisdictional. As the opinion for the court acknowledges, however, this court held the opposite only three years ago, in *Capitol Hill Restoration Society v. District of Columbia Mayor's Agent for Historic Preservation*, 44 A.3d 271, 277 (D.C. 2012). The opinion for the court may well be correct that subsequent Supreme Court cases have drawn into question our holding in *Capitol Hill Restoration Society*, but I am

reluctant to decide that issue unnecessarily. The issue has not been briefed by the parties, and we can rule more narrowly.

Under the unique-circumstances doctrine, this court has refused to enforce otherwise jurisdictional time limits if the party seeking review was affirmatively misled by the authorities about where or when to seek review. *See, e.g.*, *Frazier v. Underdue-Frazier*, 803 A.2d 443, 444-45 (D.C. 2002) (unique-circumstances doctrine permits court of appeals to treat untimely notice of appeal as timely, even if time limit is mandatory and jurisdictional, if untimeliness resulted from reasonable reliance on affirmatively misleading action of trial court) (citing cases); *Pierola v. Moschonas*, 687 A.2d 942, 945-47 (D.C. 1997) (same). That doctrine seems a perfect fit for the circumstances of this case. First, the applicable DCHA regulation directed Mr. Mathis to Superior Court. *See* 14 DCMR § 8905.4 (a) (2010). Second, the final order at issue in this case pointed Mr. Mathis to Superior Court. Third, all the way up until oral argument in this case, DCHA took the position that Mr. Mathis was required to seek review in Superior Court rather than this court.

I recognize that the Supreme Court has overruled the unique-circumstances doctrine. *Bowles v. Russell*, 551 U.S. 205, 208-14 (2007). This court has not yet addressed *Bowles*'s implications for the unique-circumstances doctrine in this court, and the parties in this case have not briefed that issue. I do not think that the court needs to decide the issue in this case. Under this court's prior decisions, Mr. Mathis's petition is not time-barred because compliance with an otherwise jurisdictional time-limit would be excused under the unique-circumstances doctrine. Assuming that the opinion for the court in this case is correct, subsequent Supreme Court decisions support a conclusion that Mr. Mathis's petition is not time-barred because the applicable time limit is not jurisdictional and Mr. Mathis would be entitled to equitable tolling of that time limit. Given that Mr. Mathis's petition is not time barred under either approach, the court in this case has no need to decide between the approaches. In theory, this court could rely on *Bowles* to overrule the unique-circumstances doctrine while adhering to the view that the time-period at issue in this case is jurisdictional. Mr. Mathis's petition would be time-barred under that approach, but such an approach in my view would be doctrinally unwarranted and would lead to unfair results in cases such as this. I therefore would simply hold that Mr. Mathis's petition is not time-barred, whether under our current law or under the different approach suggested by more recent Supreme Court cases.

Although the opinion for the court suggests that this court should not leave in "legal limbo" the question whether a time limit for review is jurisdictional in character, this court has repeatedly declined to resolve such issues when resolving them was not necessary to decide the particular case before the court. *See Neill v. District of Columbia Pub. Emp. Relations Bd.*, 93 A.3d 229, 237 n.34 (D.C. 2014) ("For purposes of this appeal, we need not decide whether our decisions labeling the time limit jurisdictional remain good law in light of subsequent Supreme Court cases (including those cited in the next paragraph) distinguishing jurisdictional rules from claim-processing rules."); *Clark v. Bridges*, 75 A.3d 149, 151 n.1 (D.C. 2013) ("In light of our conclusion that the landlord's appeal must be allowed, we do not reach the tenant's argument that if the appeal was untimely, the court would lack jurisdiction to entertain it."); *In re Na. H.*, 65 A.3d 111, 116 (D.C. 2013) ("We need not determine whether the time limit before us is jurisdictional in nature because the outcome of this appeal would be the same regardless of its status." *See District of Columbia v. Wical Ltd. P'ship*, 630 A.2d 174, 182 (D.C. 1993) (reviewing court should avoid deciding issues that are unnecessary to a case's disposition)."). In my view, following that course is particularly appropriate in this case, because the parties have not briefed the issues the opinion for the court decides. It is of course true that we are obliged to determine that we have jurisdiction before ruling on the merits in a case. I conclude that we do have

jurisdiction, whether we adhere to our decisions or adopt those of the Supreme Court. Our decisions in *Neill*, *Clark*, and *In re Na. H.* demonstrate that we are not obliged to raise and answer all "jurisdictional questions," even if those questions need not be answered in order to conclude that we have jurisdiction. As the opinion for the court accurately points out, my analysis rests on the conclusion that it would not make sense to adopt only half of the Supreme Court's law. But that conclusion is far narrower than the holdings of the opinion for the court that two separate lines of this court's authority are no longer good law.

Finally, I dissent from the holding in Part III of the opinion for the court that there was not substantial evidence to support a conclusion that Mr. Ratchford more likely than not "stayed" at Mr. Mathis's apartment for more than thirty days. I note at the outset that I am not entirely sure how "stay" should be interpreted for purposes of the Administrative Plan. For current purposes, I assume (as the parties and the opinion for the court seem to assume) that "stay" is synonymous with "reside," which is the term used in 24 C.F.R. § 982.551(h)(2) (2015). Under that assumption, I conclude that there was substantial evidence to support a conclusion that Mr. Ratchford more likely than not stayed at Mr. Mathis's apartment for more than thirty days.

Our inquiry is deferential, and we are required to give the agency the benefit of all reasonable inferences from the record. *See generally, e.g.*, *Vogel v. District of Columbia Office of Planning*, 944 A.2d 456, 463-64 (D.C. 2008) ("Substantial evidence, as we often have said, means more than a mere scintilla. What we have demanded is relevant and admissible evidence that a reasonable mind would accept as adequate—a well-worn phrasing that is deferential to the administrative agency's prerogatives as trier of fact but not toothless in its insistence on evidence with genuine probative force. The test is comparable to that we employ in reviewing sufficiency of the evidence to withstand a motion for judgment as a matter of law: the opponent of the motion must be given the benefit of every reasonable inference from the evidence, but not inferences based on guess or speculation.") (footnotes and internal quotation marks omitted). Moreover, the evidence must be considered in its totality, not item by item. *Kalorama Citizens' Ass'n v. District of Columbia Bd. of Zoning Adjustment*, 934 A.2d 393, 400 (D.C. 2007) (court will uphold agency factual finding if "based on substantial evidence in the record as a whole"); *cf., e.g.*, *In re K.M.*, 75 A.3d 224, 235 n.6 (D.C. 2013) (emphasizing that sufficiency of evidence "must in the end be assessed in light of the evidence taken as a whole," not on "the weight of various pieces of evidence in isolation"). Finally, as the opinion for the court notes, the DCHA in this case bore the burden of proof by a preponderance of the evidence. In other words, the

question for this court is whether, considering the totality of evidence, a reasonable factfinder could conclude that it was more likely than not that Mr. Ratchford stayed at Mr. Mathis's apartment for over thirty days. *See generally, e.g.*, *V.K. v. Child & Family Servs. Agency*, 14 A.3d 628, 633 n.10 (D.C. 2011) ("The preponderance of the evidence standard requires proof that something more likely than not exists or occurred.") (internal quotation marks omitted).

In my view, the evidence permitted a reasonable factfinder to conclude that Mr. Ratchford more likely than not stayed in Mr. Mathis's apartment for more than thirty days. Specifically, there was evidence that (1) Mr. Mathis was arrested on August 28, 2009; (2) Mr. Mathis was concerned about the security of the apartment, because someone broke into the apartment; (3) no one other than Mr. Mathis was authorized to stay in the apartment, so there was no authorized occupant to keep an eye on the apartment; (4) Mr. Mathis made arrangements to have Mr. Ratchford keep an eye on the apartment; (5) Mr. Mathis and Mr. Ratchford have a very close, family-type relationship, referring to each other as brothers or cousins; (6) Mr. Mathis gave Mr. Ratchford (and apparently only Mr. Ratchford) a key to the apartment (although some of the testimony about whether Mr. Mathis directly gave Mr. Ratchford a key was unclear, in part at least because the transcript is garbled, Mr. Mathis ultimately testified clearly that he gave a key

to Mr. Ratchford); (7) Mr. Ratchford was arrested at the apartment on September 11, 2009, and a police report prepared in connection with the arrest indicated that Mr. Ratchford lived at the apartment; (8) Mr. Ratchford was present at the apartment on October 7, 2009, and told an investigator that "they" (inferentially Mr. Mathis and Mr. Ratchford) were in the process of moving; and (9) on October 13, 2009, Mr. Mathis told an investigator that Mr. Ratchford "was living [at the apartment] with Mr. Mathis" and "had been living with [Mr. Mathis] for a period of time" or "from time-to-time."

Taken together, that evidence seems to me to permit a reasonable conclusion that Mr. Ratchford more likely than not stayed at Mr. Mathis's apartment from at least September 11, 2009, to October 13, 2009, which is thirty-two days. Specifically, a factfinder could reasonably conclude that Mr. Ratchford more likely than not was staying in the apartment as of September 11, 2009, because there was evidence permitting an inference that Mr. Ratchford gave the apartment as his address on that date. Moreover, a factfinder could further conclude that Mr. Ratchford more likely than not stayed in the apartment through October 7, 2009, because there was evidence that Mr. Ratchford was present at the apartment on that date and made a statement that can be reasonably understood to indicate that Mr. Ratchford and Mr. Mathis were in the process of moving out together. Finally, a

reasonable factfinder could conclude that Mr. Ratchford more likely than not stayed in the apartment through October 13, 2009, because there was evidence that Mr. Mathis made a statement on that date indicating that Mr. Ratchford was living with Mr. Mathis and had been doing so for a period of time.

The foregoing evidence did not establish beyond doubt that Mr. Ratchford stayed in Mr. Mathis's apartment for more than thirty days. It is possible that Mr. Ratchford had some other residence for some or all of the time period in question, although there was no specific evidence in the record of such a residence. It is also possible that Mr. Ratchford and Mr. Mathis were moving out to separate destinations, and that Mr. Ratchford did so right after October 7, 2009. On the other hand, it is possible, perhaps probable, that Mr. Ratchford was not so unfortunate as to be arrested in the apartment on the very day he began his stay there, and that he in fact had been staying in the apartment for some time before September 11, 2009. These various possibilities, however, do not undermine the conclusion that the evidence, considered as a whole, permitted a reasonable factfinder to find that Mr. Ratchford more likely than not stayed in the apartment for more than thirty days. Even under the far more demanding standard of proof beyond a reasonable doubt, the evidence "need not negate every possible hypothesis of innocence." *Miller v. United States*, 115 A.3d 564, 570 (D.C. 2015).

Although the opinion for the court concludes that the evidence was insufficient, my analysis differs in three principal respects. First, the opinion for the court does not give adequate weight to the evidence of the statement that Mr. Mathis made on October 13, 2009, indicating that Mr. Ratchford was living with Mr. Mathis and had been doing so for a period of time. Second, it is true, as the opinion for the court notes, that Mr. Ratchford was arrested on September 11, 2009. But Mr. Mathis has not contended that Mr. Ratchford's arrest is relevant to the sufficiency of the evidence, and I see no basis for concluding that the arrest caused a change in Mr. Ratchford's residence or otherwise undermined the sufficiency of the evidence. Third, the opinion for the court appears to focus on pieces of evidence in isolation, rather than assessing the reasonable conclusions that can be drawn when considering the evidence in its totality.

For the foregoing reasons, I would hold that that there was substantial evidence to support the conclusion that Mr. Ratchford more likely than not stayed in Mr. Mathis's apartment for more than thirty days. I therefore respectfully dissent in part. Having concluded that the evidence was insufficient, the opinion for the court does not reach Mr. Mathis's other procedural challenges. Although I see no reason to expound on the issue, I would remand the matter to DCHA for further consideration in light of those procedural challenges. *Cf., e.g., Dillon v.*

*District of Columbia Dep't of Emp't Servs.*, 912 A.2d 556, 560-61 (D.C. 2006)

(remanding for further findings where agency failed to make adequate findings).